UNITED STATES BANKRUPTCY COURT                    **FOR PUBLICATION**

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | Chapter 11 |
| BAYOU GROUP, LLC, *et al.*, | Case No. 06 B 22306 (ASH) |
| Debtors. | Jointly Administered |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. | Adv. Proc. No. 06-08318A |
| Bayou No Leverage Fund, LLC v. Christian Brothers High School Endowment | Adv. Proc. No. 06-08320A |
| Bayou Superfund, LLC v. D. Canale Beverages, Inc. | Adv. Proc. No. 06-08321A |
| Bayou No Leverage Fund, LLC v. Fred Montesi IRA and Fred Montesi | Adv. Proc. No. 06-08329A |
| Bayou Superfund, LLC v. Helen Yulman Revocable Trust | Adv. Proc. No. 06-08332A |
| Bayou Superfund, LLC v. Heritage Hedged Equity Fund LP | Adv. Proc. No. 06-08333A |
| Bayou Superfund, LLC v. John D. Canale III | Adv. Proc. No. 06-08336A |
| Bayou Superfund, LLC v. KFI Capital Partners LLC | Adv. Proc. No. 06-08337A |
| Bayou Superfund, LLC v. Mary P. Smythe Residuary Trust | Adv. Proc. No. 06-08338A |
| Bayou Superfund, LLC v. Mary Jane Pidgeon Sledge | Adv. Proc. No. 06-08339A |
| Bayou No Leverage Fund, LLC v. Mayer and Morris Kaplan Foundation | Adv. Proc. No. 06-08340A |
| Bayou Superfund, LLC v. YK Investment Partnership II | Adv. Proc. No. 06-08341A |
| Bayou Superfund, LLC v. Marvin E. Bruce Living Trust | Adv. Proc. No. 06-08368A |
| Bayou Accredited Fund, LLC v. Freestone Low Volatility Partners LP | Adv. Proc. No. 06-08373A |
| Bayou Superfund, LLC v. William Strang | Adv. Proc. No. 06-08387A |
| Bayou Superfund, LLC v. Randall M. Rothstein and Sheryl B. Rothstein | Adv. Proc. No. 06-08389A |
| Bayou Superfund, LLC v. Alan Osofsky | Adv. Proc. No. 06-08398A |
| Bayou Accredited Fund, LLC v. Madison Capital Advisors Ltd. | Adv. Proc. No. 06-08403A |
| Bayou Superfund, LLC v. Highgate Partners LP | Adv. Proc. No. 06-08412A |
| Bayou No Leverage Fund, LLC v. DW Resources Defined Benefit Plan and Marc Daniels | Adv. Proc. No. 06-08415A |
| Bayou Superfund, LLC v. Michael Mann | Adv. Proc. No. 06-08419A |
| Bayou Superfund, LLC v. Myrna Bennett | Adv. Proc. No. 06-08420A |
| Bayou Superfund, LLC v. H & B Hedge Fund II LLC | Adv. Proc. No. 06-08422A |
| Bayou No Leverage Fund, LLC v. Marc Fleisher IRA and Marc Fleisher | Adv. Proc. No. 06-08423A |
| Bayou No Leverage Fund, LLC v. Peter Haje IRA and Peter Haje | Adv. Proc. No. 06-08430A |
| Bayou Superfund, LLC v. Kevin Bass | Adv. Proc. No. 06-08431A |
| Bayou Superfund, LLC v. Michael Davidson | Adv. Proc. No. 06-08435A |
| Bayou Superfund, LLC v. Sterling Stamos Security Fund, L.P., Sterling Stamos Security Fund - Friends and Family, L.P., Sterling Stamos Growth Fund,  L.P., and Sterling Stamos Liquidity Fund, L.P. | Adv. Proc. No. 06-08493A |
| Bayou Superfund, LLC v. DB Structured Products Inc. | Adv. Proc. No. 06-08494A |
| Bayou Superfund, LLC v. High Sierra Investments | Adv. Proc. No. 07-08243A |
| Bayou No Leverage Fund, LLC v. John Barr III IRA and John Barr III | Adv. Proc. No. 07-08244A |
| Bayou Superfund, LLC v. Neil D. Cohen | Adv. Proc. No. 07-08245A |
| Bayou Accredited Fund, LLC v. Edward Sorkin and Virginia Sorkin | Adv. Proc. No. 07-08246A |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

A P P E A R A N C E S :

Gary J. Mennitt, Esq.
Jonathan D. Perry, Esq.
Elise Scherr Frejka, Esq.
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
*Attorneys for the Debtors and Debtors-in-Possession*

Tracy L. Klestadt, Esq.
Brendan Scott, Esq.
KLESTADT & WINTERS, LLP
292 Madison Avenue, 17th Floor
New York, NY 10017-6314
*Attorneys for the Debtors and Debtors-in-Possession*

Carole Neville, Esq.
SONNENSCHEIN NATH & ROSENTHAL LLP
1221 Avenue of the Americas
New York, NY 10020-1089
*Attorneys for Twenty-four Defendants*

Jeff F. Friedman, Esq.
KATTEN, MUCHIN, ROSENMAN, LLP
575 Madison Avenue
New York, NY 10022
*Attorneys for Peter Haje IRA and Peter Haje*

Richard B. Feldman, Esq.
ROSENBERG FELDMAN SMITH, LLP
551 Fifth Avenue, 24th Floor
New York, NY 10176
*Attorneys for Freestone Low Volatility Partners, LP*

Kevin Burke, Esq.
CAHILL, GORDON & REINDEL
80 Pine Street
New York, NY 10005
*Attorneys for DB Structured Products Inc.*

Marcy Harris, Esq.
SCHULTE, ROTH & ZABEL, LLP
919 Third Avenue
New York, NY 10022
*Attorneys for Sterling Stamos Security Fund, L.P.,*
 *Sterling Stamos Security Fund - Friends and Family, L.P.,*
 *Sterling Stamos Growth Fund, L.P., and Sterling Stamos*
 *Liquidity Fund, L.P.*

Joseph W. Allen, Esq.
JAECKLE FLEISCHMANN & MUGEL, LLP
700 Fleet Bank Building
Buffalo, NY 14202
*Attorneys for Christian Brothers High School Endowment*

H. William Munno, Esq.
SEWARD & KISSEL, LLP
One Battery Park Plaza
New York, NY 10004
*Attorneys for Mary Jane Pidgeon Sledge*

P. Gregory Schwed, Esq.
LOEB & LOEB, LLP
345 Park Avenue
New York, NY 10154
*Attorneys for Highgate Partners LP*

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

**Table of Contents**

**Page**

**Jurisdiction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**Overview of the Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**Prior Motions to Dismiss** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

**Discussion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

**I.**      **Standards for summary judgment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

**II.**     **Section 548(a) issues and conclusions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

      **A.**      **The statute and case law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

      **B.**      **The evidence: criminal pleas/allocutions and the Lenhart Report** . . . . . . . . . . . . . . . . . . . **12**

            **1.**      **What the evidence shows** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

                **(a)**      **Guilty pleas and allocutions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

                **(b)**      **The Lenhart Report** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

            **2.**      **Admissibility** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

                **(a)**      **Guilty pleas and allocutions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

                **(b)**      **The Lenhart Report** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

      **C.**      **No triable issues of fact** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

      **D.**      **Ultimate findings and conclusions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

            **1.**      **Actual fraud under Section 548(a)(1)(A)** . . . . . . . . . . . . . . . . . . . . . . . . . **34**

            **2.**      **Constructive fraud under Section 548(a)(1)(B)** . . . . . . . . . . . . . . . . . . . . . **35**

**III.**    **Section 548(c) issues and conclusions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

      **A.**      **The statute and case law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

      **B.**      **Background:  good faith defenses accepted by plaintiffs** . . . . . . . . . . . . . . . . . . . . . . . **48**

            **1.**      **Proceedings not settled** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **48**

                **John Barr III IRA and John Barr III (Adv. Proc. No. 07-08244)**
                **Myrna Bennett (Adv. Proc. No. 06-08420)**
                **Madison Capital Advisors Ltd. (Adv. Proc. No. 06-08403)** . . . . . . . . . . . . . . . . . . . . . . **48**

            **2.**      **Proceedings settled** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **48**

      **C.**      **Good faith defenses sustained** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **49**

            **1.**      **DB Structured Products, Inc. (Adv. Proc. No. 06-08494)** . . . . . . . . . . . . . . . . . . **50**

            **2.**      **High Sierra Investments (Adv. Proc. No. 07-08243)** . . . . . . . . . . . . . . . . . . . **53**

            **3.**      **Michael Mann (Adv. Proc. No. 06-08419)** . . . . . . . . . . . . . . . . . . . . . . . . . **56**

**Page**

**D.**      **Issues of fact requiring a trial** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **59**

     **1.**      **William Strang (Adv. Proc. No. 06-08387)**
            **Randall M. and Sheryl B. Rothstein (Adv. Proc. No. 06-08389)**
            **Alan Osofsky (Adv. Proc. No. 06-08398)**
            **DW Resources DBP and Marc Daniels (Adv. Proc. No. 06-08415)**
            **Marc Fleisher IRA and Marc Fleisher (Adv. Proc. No. 06-08423)**
            **Kevin Bass (Adv. Proc. No. 06-08431)**
            **Michael Davidson (Adv. Proc. No. 06-08435)**
            **Neil D. Cohen (Adv. Proc. No. 07-08245)**
            **Edward and Virginia Sorkin (Adv. Proc. No. 07-08246)** . . . . . . . . . . . . . . . . . . . . . . . **59**

     **2.**      **Mary Jane Pidgeon Sledge (Adv. Proc. No. 06-08339)** . . . . . . . . . . . . . . . . . . . . . . . . . . . **60**

     **3.**      **Sterling Stamos Funds (Adv. Proc. No. 06-08493)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **60**

     **4.**      **Highgate Partners LP (Adv. Proc. No. 06-8412)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **64**

**E.**      **Summary judgment granted for plaintiffs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **66**

     **1.**      **Background: the Altegris due diligence** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **66**

     **2.**      **Background: the *Westervelt* complaint** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **69**

     **3.**      **Investigation by CSG and Centennial** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **72**

     **4.**      **Imputation of CSG's knowledge to its clients** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **77**

     **5.**      **Facts specific to the CSG or Centennial clients** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **79**

         **(a)**      **Redwood Growth Partners, L.P. (Adv. Proc. No. 06-08318)**
              **Heritage Hedged Equity Fund LP (Adv. Proc. No. 06-08333)** . . . . . . . . . . . . . . . . . **79**

         **(b)**      **Christian Brothers High School Endowment (Adv. Proc. No. 06-08320)** . . . . . . . . **80**

         **(c)**      **D. Canale Beverages, Inc. (Adv. Proc. No. 06-08321)**
              **John D. Canale III (Adv. Proc. No. 06-08336)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **82**

         **(d)**      **Marvin E. Bruce Living Trust (Adv. Proc. No. 06-08368)** . . . . . . . . . . . . . . . . . . . **83**

         **(e)**      **Mary P. Smythe Residuary Trust (Adv. Proc. No. 06-08338)** . . . . . . . . . . . . . . . . . **85**

         **(f)**      **KFI Capital Partners LLC (Adv. Proc. No. 06-08337)**
              **YK Investment Partnership II (Adv. Proc. No. 06-08341)**
              **Helen Yulman Revocable Trust (Adv. Proc. No. 06-08332)**
              **Mayer and Morris Kaplan Foundation (Adv. Proc. No. 06-08340)** . . . . . . . . . . . **86**

         **(g)**      **Fred Montesi IRA and Fred Montesi (Adv. Proc. No. 06-08329)** . . . . . . . . . . . . . . **88**

     **6.**      **H & B Hedge Fund II LLC (Adv. Proc. No. 06-08422)** . . . . . . . . . . . . . . . . . . . . . . . . . . . **88**

     **7.**      **Freestone Low Volatility Partners LP (Adv. Proc. No. 06-08373)** . . . . . . . . . . . . . . . . . . . **90**

     **8.**      **Peter Haje IRA and Peter Haje (Adv. Proc. No. 06-08430)** . . . . . . . . . . . . . . . . . . . . . . . . **92**

**IV.**      **Fictitious profits calculation on 2003 fund exchanges** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **96**

**Orders** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **97**

## DECISIONS ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Before the Court are motions, and in most cases cross-motions, for summary judgment in thirty-three adversary proceedings brought by plaintiffs-debtors Bayou Accredited Fund, LLC, Bayou No Leverage Fund, LLC and Bayou Superfund, LLC (collectively "plaintiffs," or the "Bayou hedge fund[s]," or simply "Bayou") against defendants-investors in the Bayou hedge funds who successfully redeemed their investments within one year prior to the public collapse in August 2005 of the Bayou hedge fund empire.  Plaintiffs sue under Section 548(a) of the Bankruptcy Code, 11 U.S.C. § 548(a), and Section 544 of the Code and Sections 273-76 of the New York Debtor and Creditor Law ("DCL")[1] to recover as fraudulent conveyances the amounts paid to these redeeming investors, including principal invested and "fictitious profits" fraudulently reported by the Bayou hedge funds' prior management.[2]

### Jurisdiction

This Court has jurisdiction over these core adversary proceedings under 28 U.S.C. §§ 1334(b) and 157(a) and (b)(2) and the standing order of reference to bankruptcy judges dated July 10, 1984 signed by Acting Chief Judge Robert J. Ward.

### Overview of the Facts

The material facts as alleged in the amended complaints and as established by the evidence may be briefly summarized.

The original Bayou Fund was organized by Sam Israel, James Marquez and Daniel Marino in 1996.  The Bayou Fund and its successor Bayou hedge funds were managed by Bayou Management LLC ("Bayou Management"), which was owned by Israel.  From inception in 1996 through 2005 Israel served as the *de facto* Chief Executive Officer and Marino as the Chief Financial Officer of

---

[1]    Because the relevant provisions of the DCL are substantially similar to the Bankruptcy Code under Section 548, the discussion here will focus on Section 548.

[2]    Plaintiffs have settled similar fraudulent conveyance claims against redeeming investors in eighty-seven adversary proceedings, leaving unresolved the claims asserted against the thirty-six defendants in these thirty-three adversary proceedings.

Bayou Management.   The trading activity of the Bayou Fund and the successor Bayou hedge funds was conducted through a broker-dealer called Bayou Securities LLC ("Bayou Securities"), which was owned by Bayou Group, LLC.

Soon after the Bayou Fund started trading, it sustained losses.  To conceal those losses, the Bayou Fund began falsifying its financial disclosures and fraudulently misrepresenting its investment performances.  Because the Bayou Fund's losses could not withstand the scrutiny of an independent audit, the Bayou Fund's independent auditor was terminated and, in its place, Marino (an accountant) created a fictitious accounting firm (Richmond-Fairfield Associates, CPA, PLLC) to pose as the independent auditor.

From 1999 to 2003 the Bayou Fund continued to lose substantial amounts of money and never earned a profit, all the while drawing in millions of dollars of new investments.  As a result of a reorganization in February 2003, the original Bayou Fund was liquidated and four separate on-shore hedge funds were created, including the three Bayou hedge funds which are the debtor-plaintiffs in these adversary proceedings (the fourth new hedge fund was available only to Bayou employees and affiliates). Investors could exchange their investment in the original Bayou Fund for any of the three new Bayou hedge funds.   Each of the new Bayou hedge funds subsequently sustained losses which were concealed through dissemination of false investment performance reports and false financial statements.

Beginning in 1999 and continuing through 2005 Israel and Marino caused the Bayou entities, under cover of purported "audits" by Richmond-Fairfield, to continue to generate false perform-ance summaries and false financial statements designed to mislead investors.   The Bayou hedge funds reported their performance returns to existing and prospective investors in weekly, monthly, quarterly and annual financial reports, individual investor monthly account statements, and in marketing materials. Plaintiffs have submitted as P-BAY Ex. 10 the Richmond-Fairfield certified financial statements of Bayou Fund for December 31, 2000, 2001 and 2002 and for the Bayou "Family of Funds" for the two years ending December 31, 2003 and 2004.  Each of these year-end financial statements was preceded by a Richmond-Fairfield Associates cover sheet entitled "Financial Statements and Report of Independent

Certified Public Accountants." Each of these annual financial statements contained a covering letter on

Richmond-Fairfield Associates letterhead stating:

> We have audited the accompanying statement of financial condition, including the
> condensed schedule investments, of [the identified Bayou funds].
>
> We conducted our audit in accordance with generally accepted auditing standards. . . .
> We believe that our audit provides a reasonable basis for our opinion.
>
> In our opinion, the financial statements referred to above, present fairly, in all material
> respects, the financial position of [the various Bayou funds] and the results of its opera-
> tions, changes in its members' capital and cash flows for the year then ended, in conform-
> ity with generally accepted accounting principles.

The representation that Richmond-Fairfield was an independent firm of certified public

accountants was false. Each of the representations quoted just above was false. And as shown in the

Lenhart Report described below, the financial data with respect to the Bayou hedge funds was false.

In addition to trading losses, the amended complaints alleged that the Bayou hedge funds

were depleted for the personal financial benefit of the principals of Bayou. Millions of dollars in high

volume trading commissions were paid to the broker-dealer Bayou Securities wholly owned by the prin-

cipals, and millions of dollars of incentive bonus payments were made to the principals based on non-

existent profits.[3] Management of the Bayou hedge funds made a bank transfer of $120 million drawn

from various Bayou accounts to a bank account in PostBank, Germany, of which $100 million was

eventually deposited in a bank account in the United States. This bank account was seized by the Arizona

Attorney General in May 2005, and the funds were eventually transferred to the United States Marshals

Service for distribution *pro rata* to victims of the Bayou fraud.

During the summer of 2005 the Bayou entities finally collapsed. Despite assurance of

full payment to the investors, the Bayou hedge funds did not repay any money to the then existing

investor-creditors, who held approximately $250 million principal invested.

---

[3]    The February 6, 2003 letter notifying investors of their right to exchange their Bayou Fund
investments for any of the three new Bayou hedge funds stated that pursuant to the Operating
Agreement Bayou Management would take a "twenty percent (20%) incentive fee."

The terms governing redemptions of investments from the Bayou hedge funds were set forth in the Operating Agreement for each fund.  Section 10.1 of each Operating Agreement provided that any investor was permitted to redeem the "whole or any part of the amount in his or its Capital Account at the end of any calendar month" upon fifteen days' written notice.   Under Section 10.4 of each of the Operating Agreements, after receipt of a redemption notice from an investor the particular Bayou hedge fund was required to pay "90% of the amount of [the investor's] Capital Account withdrawn within thirty (30) days of the effective date of the withdrawal," with "the balance of the amount due within thirty-one (31) days after the Company has received financial statements for the year ending as of the withdrawal date."

The fraudulent conveyance claims asserted in these adversary proceedings seek to recover payments made to the defendant Bayou investors in purported redemption of part or all of their investment interests in the several Bayou hedge funds as reflected in the published financials for each of the funds.  Since the financials fraudulently overstated the assets and failed to disclose the losses of the Bayou hedge funds and, therefore, overstated the investment accounts of all of the redeeming investors, the redemption payments in respect of greatly reduced or non-existent principal and fictitious profits exceeded the redeeming investors' contractual entitlements.

### Prior Motions to Dismiss

Defendants have previously made two motions to dismiss, both of which were denied by this Court.  In the first, defendants in ninety-five adversary proceedings argued, *inter alia*, that the amended complaints failed to allege actual intent to defraud with sufficient particularity under Federal Rule of Civil Procedure 9(b) and failed to allege lack of good faith on the part of the defendants.  *See In re Bayou Group, LLC*, 362 B.R. 624 (Bankr. S.D.N.Y. 2007) ("*Bayou I*").  In denying the motions, this Court addressed defendants' misplaced reliance on a decision of the Court of Appeals for the Second Circuit in *Sharp International Corp. v. State Street Bank and Trust Company (In re Sharp International Corp.)*, 403 F.3d 43 (2d Cir. 2005) ("*Sharp International*") and a prior decision of this Court in *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortgage Investment Corp.)*, 256 B.R. 664 (Bankr.

S.D.N.Y. 2000), *aff'd sub nom. Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001).   Since this

Court's views on the relevance to these proceedings of the *Sharp International* and *Churchill* decisions

have been fully explained in *Bayou I*, *see* 362 B.R. at 636-638, I shall not address defendants' similar

contentions on these motions.

       In denying the second motion to dismiss filed on behalf of defendants in twenty-four ad-

versary proceedings, this Court rejected arguments that the non-redeeming investors in the Bayou hedge

funds are not creditors of the plaintiff hedge funds and a related argument under Section 510(b) of the

Bankruptcy Code.  *See In re Bayou Group, LLC*, 372 B.R. 661 (Bankr. S.D.N.Y. 2007) ("*Bayou II*").

<u>**Discussion**</u>

**I.**      <u>**Standards for summary judgment**</u>

       Federal Rule of Civil Procedure 56(c) applies to bankruptcy proceedings by application

of Rule 7056 of the Federal Rules of Bankruptcy Procedure and provides that summary judgment is

proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986); *Morenz v. Wilson-Coker*, 415 F.3d 230, 234 (2d Cir. 2005).  The movant has the initial bur-

den of demonstrating the absence of any genuine issue of material fact.  *See Celotex,* 477 U.S. at 323.

       In deciding whether material factual issues exist, the Court must resolve all ambiguities

and draw all reasonable inferences against the moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986).  However, the existence of disputed issues of fact will not result in de-

nial of a motion for summary judgment unless the disputed issues are material to the determination of the

legal claims and defenses.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes

over facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment."); *see also*, *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc*., 67 F.3d

1063, 1066 (2d Cir. 1995).  If the record in its entirety could not lead a rational trier of fact to find for the

non-movant, then no genuine issue remains for trial.  *Matsushita*, 475 U.S. at 587.

Once the movant establishes its initial burden, the burden shifts to the non-movant to establish that there is a specific and genuine issue of material fact to warrant a trial.  *Celotex*, 477 U.S. at 324.  The non-movant must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'" establish that there is a specific and genuine issue of material fact warranting a trial.  *Celotex*, 477 U.S. at 324.

Conjecture, surmise or "metaphysical doubt" by the non-movant of the movant's assertions will not defeat a summary judgment motion.  *See Matsushita,* 475 U.S. at 586; *see also*, *Bryant v. Maffuci*, 923 F.2d 979, 982 (2d Cir. 1991).   Self-serving conclusory statements are also insufficient to defeat summary judgment.  *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).  The non-movant must present specific significant probative evidence supporting its case sufficient "to require a  . . .  judge to resolve the parties' differing versions of the truth at trial."  *Anderson,* 477 U.S. at 249 (citation omitted); *accord, Moratzka v. Visa U.S.A.* (*In re Calstar, Inc.*), 159 B.R. 247, 251 (Bankr. D. Minn. 1993).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.

The non-movant must present "substantial evidence" to overcome the motion, and the court must analyze "the evidence presented through the prism of the substantive evidentiary burden."  *Anderson,* 477 U.S. at 250-54.  "The nonmovant must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials."  *In re Teligent, Inc.*, 337 B.R. 39, 43 (Bankr. S.D.N.Y. 2005) (citations omitted).  "If, however, the evidence tendered is 'merely colorable,' or

is 'not significantly probative,' the non-moving party has not carried its burden and the court must grant

summary judgment to the moving party." *In re Calstar, Inc.*, 159 B.R. at 252 (citation omitted).

## II.    Section 548(a) issues and conclusions

### A.    The statute and case law

Plaintiffs' *prima facie* case for intentional fraudulent conveyance is governed by Section

548(a)(1)(A) of the Bankruptcy Code.  Section 548(a)(1)(A) provides as follows:

> (a) (1) The trustee may avoid any transfer (including any transfer to or for the benefit of
> an insider under an employment contract) of an interest of the debtor in property, or any
> obligation (including any obligation to or for the benefit of an insider under an employ-
> ment contract) incurred by the debtor, that was made or incurred on or within 2 years
> before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> > (A) made such transfer or incurred such obligation with actual intent to hinder,
> > delay, or defraud any entity to which the debtor was or became, on or after the
> > date that such transfer was made or such obligation was incurred, indebted; or. . .

Several observations may be made concerning this statute which are germane to the

motions for summary judgment.  Under Section 548(a)(1)(A) the ***entire*** amount of "any transfer" made

with actual intent to hinder, delay or defraud creditors may be avoided.  The entire amount is avoidable

whether or not the debtor received value in exchange.  *See, e.g.*,  *Sharp International*, 403 F.3d 43, 56

(applying the analogous intentional fraudulent conveyance provision of New York law); *see Bayou I*, 362

B.R. at 629-30 and cases cited therein.

The malicious intent sufficient to support a cause of action is set forth in the disjunc-

tive—a plaintiff may avoid the transfer where it was made with intent "to hinder, delay, ***or*** defraud" (em-

phasis added).  *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003) (interpreting N.Y.

Debt. & Cred. Law § 276); *Flushing Sav. Bank v. Parr*, 81 A.D.2d 655, 656 (N.Y. App. Div. 1981),

*appeal dismissed*, 54 N.Y.2d 770 (1981) (same); 5 Collier on Bankruptcy ¶ 548.04[1] at 548-23 (15th ed.

rev. 2006) and cases cited therein.  *But see, e.g.*, *Addison v. Seaver (In re Addison)*, 2008 U.S. App.

LEXIS 16684 at *14-*16 (8th Cir. Aug. 7, 2008).  This malicious intent can be directed at either present

or future creditors of the debtor as of the date of the transfer.  *See* 5 Collier on Bankruptcy ¶ 548.04[1] at

548-22.4 (15th ed. rev. 2006).  Thus, a plaintiff need not prove that the debtor intended to hinder, delay or

defraud the transferee or any other particular creditor. *See id.* at 548-23. Also, the statute focuses on the

debtor's "intent," such that a plaintiff need not prove that the debtor actually did, in fact, hinder, delay or

defraud the transferee or any other creditors. *See Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d

1348, 1355 (8th Cir. 1995); 5 Collier on Bankruptcy ¶ 548.04[1] at 548-24 to 548-25 (15th ed. rev.

2006).[4]

Since the statute by its express terms applies only if "the **debtor** . . . made such transfer

with intent to hinder, delay, or defaud," it is only the debtor's intent that is relevant. *See, e.g.*, *Sharp

International*, 403 F.3d 43, 56 (applying N.Y. Debt. & Cred. Law § 276); *HBE Leasing Corp. v. Frank*,

61 F.3d 1054, 1059 n.5 (2d Cir. 1995) (same); *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y.,

Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007) and cases cited there-

in; *Picard v. Taylor (In re Park S. Secs., LLC)*, 326 B.R. 505, 517 (Bankr. S.D.N.Y. 2005).[5]   The intent

of the transferee is not relevant except under the "good faith" defense of Section 548(c). In this sense

Section 548 serves the same policy function as Section 547, which allows the trustee to avoid preferential

payments made within ninety days of the bankruptcy to perfectly innocent creditors who were legally

---

[4]   If no creditor was hindered, delayed or defrauded, the transferee may have a defense to the avoid-
ance action on mootness or other grounds. However, it is not up to the trustee to prove the non-
existence of those defenses.

[5]   The defendants point to a prior decision of this Court, *Gentry v. Kovler (In re Kovler)*, 249 B.R.
238 (Bankr. S.D.N.Y. 2000), *citations corrected*, 329 B.R. 17 (Bankr. S.D.N.Y. 2005), as author-
ity that under N.Y. Debt. & Cred. Law § 276 a plaintiff must prove that both the transferor and the
transferee acted with "actual intent." *Kovler*'s statement of the law was corrected and updated in
the 2005 citation above. The original *Kovler* decision is one of several cases which mistakenly
suggest that under Section 276 a plaintiff must prove the malicious intent of both the transferor and
the transferee (with some citing *Kovler* for that proposition). *See, e.g.*, *Andrew Velez Constr., Inc.
v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 276 (Bankr.
S.D.N.Y. 2007); *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369,
396 (Bankr. S.D.N.Y. 2007); *Picard v. Taylor (In re Park S. Secs., LLC)*, 326 B.R. 505, 517
(Bankr. S.D.N.Y. 2005); *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310
B.R. 500, 508 (Bankr. S.D.N.Y. 2002). These cases are in direct conflict with governing decisions
in this Circuit holding that only the intent of the transferor is relevant under Section 276. *See, e.g.*,
*Sharp International*, 403 F.3d 43, 56; *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n.5 (2d
Cir. 1995); *Geron v. Schulman (In re Manshul Constr. Corp.)*, 2000 U.S. Dist. LEXIS 12576 at
*129 (S.D.N.Y. Aug. 29, 2000); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 999
(S.D.N.Y. 1991); *Le Café Creme, Ltd. v. Le Roux (In re Le Café Creme, Ltd.)*, 244 B.R. 221, 239
(Bankr. S.D.N.Y. 2000); *Secs. Investor Protection Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293,
318 (Bankr. S.D.N.Y. 1999); *Brody v. Pecoraro*, 250 N.Y. 56, 61 (1928) (Cardozo, J.). The
statute itself makes this clear. Section 276 is concerned only with a "conveyance made . . . with
intent," and only a transferor can be said to have "made" a conveyance. There is no reference in
this provision to the transferee or the transferee's intent.

entitled to be paid.  Both sections represent an equitable determination by Congress that under limited

circumstances creditors must share equally in the insolvency, or, in the case of Section 548, the fraud.

Section 548 is not a punitive provision designed to punish the transferee, but is instead an equitable pro-

vision that places the transferee in the same position as other similarly situated creditors who did not re-

ceive fraudulent conveyances.

It is well-settled that "actual intent to hinder, delay, or defraud" may be proven by cir-

cumstantial evidence — commonly referred to as "badges of fraud."  *See, e.g.*, *Sharp International*, 403

F.3d 43, 56 (applying N.Y. Debt. & Cred. Law § 276); *Brown v. Third Nat'l Bank (In re Sherman)*, 67

F.3d 1348, 1353 (8th Cir. 1995); *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 805 (9th Cir.

1994); *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir. 1991),

*remanded to* 149 B.R. 274 (Bankr. D. R.I. 1992).  It is sufficient for a plaintiff to demonstrate that the

transferor "acted under circumstances that preclude any reasonable conclusion other than that the purpose

of the transfer was fraudulent as to creditors."  5 Collier on Bankruptcy ¶ 548.04[1] at 548-26 (15th ed.

rev. 2006) (citing *Lesser v. Jewel Factors Corp.*, 470 F.2d 108, 110 (2d Cir. 1972)).

The plaintiffs' *prima facie* case for constructive fraudulent conveyance is governed by

Section 548(a)(1)(B).  Section 548(a)(1)(B) provides in pertinent part that the trustee can avoid a transfer

"if the debtor voluntarily or involuntarily" [omitting new subsection (IV)]:

> (B)  (i) received less than a reasonably equivalent value in exchange for such transfer
> or obligation; and
>
> (ii)    (I) was insolvent on the date that such transfer was made or such obli-
> gation was incurred, or became insolvent as a result of such transfer or
> obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in
> business or a transaction, for which any property remaining with the
> debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that
> would be beyond the debtor's ability to pay as such debts matured; or. . .

The burden is on the plaintiff to prove that the transferee received less than reasonably

equivalent value and that the debtor was insolvent as of the date of the transfer, undercapitalized or in-

tended to incur debts beyond its ability to repay.  It has been previously held as a matter of law, and there is no dispute here, that the defendants gave reasonably equivalent value for their redemptions to the extent of their original investments.  *See Bayou I*, 362 B.R. at 634.  Accordingly, the plaintiffs' constructive fraud claims under Section 548(a)(1)(B) are limited to any fictitious profits which were paid to any of the defendants.

### B.    The evidence:   criminal pleas/allocutions and the Lenhart Report

Plaintiffs' evidence in support of their claims of actual and constructive fraudulent conveyance under Section 548(a)(1)(A) and (B) consists of two elements.  One is comprised of the guilty pleas and allocutions of Israel, Marino and a third principal of Bayou, James Marquez, who resigned from Bayou in October 2001.  The other element consists of the Expert Report of William K. Lenhart (the "Lenhart Report") and the Exhibits to and documents underlying it, all of which were timely provided to defendants' attorneys.   The evidence overwhelmingly establishes the Bayou fraud alleged in the amended complaints.

### 1.    What the evidence shows

#### (a)    Guilty pleas and allocutions

The guilty plea and allocution of Israel appears in the transcript of proceedings in the District Court dated September 29, 2005 marked as P-BAY Ex. 1.  At this hearing Israel pleaded guilty to the Assistant United States Attorney's recitation of the charges in the information.  After noting that Bayou sustained trading losses during the relevant period from approximately 1999 through mid-summer 2005, the prosecutor recited the following allegations:  "[t]he defendant and co-conspirators . . . perpetrated a scheme to defraud investors by disseminating reports and financial statements among other things that contained materially false statements and by failing to invest investors' funds as promised."    P-BAY Ex. 1 at 18.   In describing the mail fraud count of the information, it was alleged that Israel "knowingly and willfully participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with a specific intent to defraud."  *Id.* at 15.

> In order to establish the elements of these crimes, the government would prove at trial, based on documentary evidence and testimony of witnesses, that during the time period set forth in the information, Samuel Israel and his co-conspirators perpetrated a fraud on investors and prospective investors of the Bayou Hedge Funds by misrepresenting the value of the Hedge Funds' assets, and including these misrepresentations to be mailed to current and prospective investors in the Southern District of New York and elsewhere.  These false and misleading statements and representations induced new investors to invest in Bayou and lulled existing investors into retaining their investments in the Bayou Hedge Funds.

*Id.* at 15-16.

> In furtherance of the scheme and because Bayou could not use an actual certified public accounting firm to audit the funds and certify the annual financial statements, Mr. Israel had his co-conspirator and chief financial officer in early 1999 form a phony accounting firm name [sic] Richmond Fairfield Associates.  And year after year between 1999 and 2004, the co-conspirators had Bayou's false financial statements sent out with a fictitious certification by Richmond Fairfield Associates that the funds had been audited and the financial statements were accurate.

*Id.* at 16.

> [Israel] and his co-conspirators caused to be mailed quarterly reports to investors that contained fictitious rates of return on trading in the funds and annual financial statements that contained fictitious rates of return on trading and inflated net assets [sic] values.  Mr. Israel and his co-conspirators also had faxed and mailed weekly newsletters that also misrepresented the performance of the funds at various times during the time period set forth in the information.   All these communications to investors made it appear that Bayou was earning profits on trading when in fact it was not.

*Id.*   The prosecutor charged that Israel and a co-conspirator carried out the conspiracy to defraud by reporting "fictitious rates of return by the Bayou Hedge Funds" in quarterly reports, weekly newsletters, monthly reports and annual financial statements mailed or faxed to investors.  *Id.* at 18.  The annual financial statements "contained among other misrepresentations, inflated rates of return on trading, inflated net asset values, and certifications that Bayou had been audited by a certified public accounting firm known as Richmond Fairfield Associates."  *Id.* at 18-19.   The prosecutor charged that "[i]n or about early 1999, a co-conspirator created the phony accounting firm Richmond Fairfield Associates and it conducted no audits."  *Id.* at 19.   "Between in or about the fall of 2003 and in or about August 2005, Israel and a co-conspirator entered and attempted to enter into private financial transactions using money from the Bayou Hedge Funds without disclosing the nature of those transactions to investors."  *Id.*  "From in or

about July 1996 through in or about August 2005, Israel and his co-conspirators induced investors to

contribute in excess of $450,000,000 to the Bayou Hedge Funds." *Id.*

    After pleading guilty to the several counts of the information, Israel described in his own

words and in response to questions the types of conduct to which he pleaded guilty.  He testified that dur-

ing the relevant time period he was the chief executive officer of Bayou Management and chief invest-

ment officer of the Bayou Fund and was responsible for trading securities on behalf of all of the funds.

*Id.* at 24.  Israel, along with others

> caused Bayou to send various kinds of documents containing false financial information
> about Bayou's performance to current and prospective clients of Bayou which made it
> appear that Bayou was performing better than it truly was.  My purpose was to induce
> these people to invest in Bayou or continue to keep their money in Bayou.   . . .  At the
> time that Bayou sent out these false materials, I knew that the terms were false and I
> knew what I was doing was wrong and fraudulent.

*Id.*

    The hearing on Marino's guilty plea and allocution also took place in the District Court

on September 29, 2005.  The transcript of the hearing is marked as P-BAY Ex. 2.  The recitations of the

Bayou scheme to defraud using weekly, monthly, quarterly and annual reports and financial statements

were substantially identical to the allegations to which Israel plead guilty.  After pleading guilty to the

several counts in the information, Marino testified in his own words

> As set forth in the information, I did participate as chief financial officer of Bayou in a
> conspiracy and a course of conduct along with other individuals to mislead investors in
> the Bayou Hedge Fund by sending them false information regarding the true status of
> their investment.  The communication to investors was sent by mail and by wire, intended
> to mislead investors.  I did not act alone when I committed these offenses.   At the end of
> 1998, we all agreed to set up an accounting firm that would give the appearance of an
> independent auditor to further the conspiracy to deceive Bayou investors.  I did form
> Richmond Fairfield Associates which certified a false financial statement of Bayou as
> true.

P-BAY Ex. 2 at 27-28.

    The guilty plea and allocution of Marquez was recorded at a hearing in the District Court

on December 14, 2006.  Summarizing elements of the crimes alleged in the information, the Assistant

United States Attorney stated that from July 1996 until October 10, 2001 Marquez, Israel and Marino

- 14 -

"perpetrated a fraud on investors and potential investors . . . by misrepresenting the value of the hedge

funds' assets and causing these misrepresentations to be disseminated to current and prospective investors

in the Southern District of New York and elsewhere."  P-BAY Ex. 3 at 15.

> [Marquez] and his co-conspirators caused to be mailed quarterly reports to investors that contained fictitious rates of return on trading in the funds and annual financial statements that contained fictitious rates of return on trading and inflated net asset value.  The evidence would establish that Mr. Marquez and Mr. Israel made up numbers.  All of these communications to investors made it appear that Bayou was earning profits on trading when, in fact, it was not.

*Id.* at 16.   In his own words, Marquez testified:

> Your Honor, during the period of time alleged in the information, I acted in the position of a portfolio manager for Bayou Fund where I helped formulate the trading strategy for the fund.  I had general knowledge of the financial status of the fund and became aware, after a period of time, that the fund was sustaining losses.

> Together with others, I caused documents to be sent via U.S. Mail to investors that contained inaccurate financial information about the Bayou Fund.  Specifically, such mailings contained false financial information that made it appear that the fund was more successful than it actually was.

> I was also aware that Richmond-Fairfield was formed to handle the audits for the Fund with the intent that the true financial statement of the Fund not be disclosed to investors.

*Id.* at 20.

> Israel, Marino and Marquez have all been sentenced to lengthy prison terms for their

crimes.  Their guilty pleas and allocutions establish the following facts:

- During the relevant period from at least 1998 through August 2005 the Bayou Fund and

  the successor Bayou hedge funds sustained trading losses.

- In late 1998, Israel, Marino and Marquez conceived a scheme to defraud existing and

  potential Bayou investors by means of creating a fictitious, purportedly independent firm

  of certified public accountants.  Marino established the fictitious firm of Richmond-

  Fairfield Associates, and for the years 1999 through 2004 Israel, Marino and (until

  October 2001) Marquez caused false annual financial statements to be certified by

Richmond-Fairfield.  In fact, Richmond-Fairfield did not conduct any audits of the Bayou financial statements.

•    During the relevant period the Bayou principals caused Bayou to issue weekly, monthly and quarterly reports and annual financial statements which falsely overstated the Bayou Fund's and the successor Bayou hedge funds' earnings and net asset values and the net asset values of the individual investors.  In fact, Israel and his co-conspirators simply "made up numbers."

•    Israel, Marino and Marquez knowingly published the fraudulent periodic reports and annual financial statements with the intention of misleading existing and prospective investors in order to induce them to retain their Bayou investments and invest new money in the Bayou hedge funds.

### (b)    **The Lenhart Report**

When the Bayou debtors, including the three plaintiff Bayou hedge funds, filed their Chapter 11 petitions in this Court, they had no material trade or borrowing debt.  The creditors of these debtors' estates are the defrauded investors who did not redeem their investments, augmented post-petition by those investors who redeemed pre-petition, settled fraudulent conveyance claims asserted against them by plaintiffs and thereby became creditors to the extent of their redemptions of principal invested repaid to the debtors' estates.

All investors in the Bayou hedge funds were creditors of the particular funds in which they invested in two separate ways.  First, under the terms of the Operating Agreement for each of the Bayou funds each investor had the contractual right to redeem part or all of his account balance in the fund, limited to his *pro rata* share of the net asset value of the fund.  Second, as a consequence of the pervasive fraud described in the guilty pleas and allocutions of the Bayou principals, all investors in the

Bayou funds have or had tort claims for rescission of the entire amount actually invested in the funds, although not including fictitious profits reported in the fraudulent financial statements.[6]

To establish their fraudulent conveyance claims in these adversary proceedings, it was incumbent on plaintiffs to perform a solvency analysis to enable the Court to determine whether or not the Bayou hedge funds were solvent during the relevant period.  Reduced to essentials, the fundamental issue in any such analysis is whether the net asset values (NAVs) of the Bayou hedge funds were less than, equal to or greater than the amounts actually invested in the funds by the investors.  To perform this analysis plaintiffs retained William K. Lenhart, CPA, CIRA, CTP, CFE ("Lenhart"), through his firm BDO Seidman, LLP ("BDO").

The Lenhart Report is comprised of a table of contents, pages of text numbered 3-39 and thirty-five Exhibits numbered Exhibit 1 through Exhibit 14 (a number of exhibits are broken into separate parts, *e.g.*, Exhibit 6.A, Exhibit 6.B, *etc.*).   All underlying documents on which the Exhibits are based (*e.g.*, monthly statements for accounts at Citibank, Cornerstone and Wachovia, brokerage statements of Spear, Leeds & Kellogg, Weis, Peck and Greer, *etc.*) were made available to counsel for all defendants. Based upon his professional credentials (set forth at pages 4-5 of his Report and Exhibit 3), I have con-cluded that Lenhart is eminently qualified to serve as an expert witness for the purpose of preparing and rendering his Report and expressing his conclusions therein.

At the outset of his Report, under the heading "Summary of Opinions," Lenhart described his task as follows:

> I undertook an assessment of the Bayou Funds' financial condition to determine whether the Bayou Funds were insolvent at, or as of, a particular time, or whether they became insolvent as a result of substantial trading losses, defalcations, and certain trans-fers, *i.e.*, the redemptions by certain investors during the **Testing Period** [January 1, 2002 to August 31, 2005];[ ] whether these losses and transfers left the Bayou Funds with unreasonably small capital or assets for the business; or whether the Bayou Funds intended to incur debts beyond their ability to pay such debts as they became due.  In this

---

[6]     As noted in the fourth paragraph under point III A, below, plaintiffs and defendants acknowledge that all Bayou investors had a valid tort claim for rescission of the full amount of their investments based on the Bayou fraud, as they must in order to establish their respective claims or defenses under Section 548(a) and Section 548(c).

Report, I have undertaken the analysis of three recognized forms of financial distress that include: (1) an adjusted balance sheet test; (2) an insufficient capital or assets test; and (3) an inability to pay debts as they become due test.  Each method provides a different, but related, perspective on the question of solvency or financial distress and must be considered in developing a profile of the Debtors' financial condition during the Testing Period.  A description and the results of these tests are discussed in Part VII.

Lenhart Report 6.   The Summary continues with an explanation of the conservative approach employed

by Lenhart with respect to the determination of net asset values:

> In my analysis and in the formulation of my opinions, I used an approach that should result in an overstatement of net asset values ("NAV")[6] in these circumstances.  For example:

> ○    I did not limit my calculation of the Bayou Funds' NAV to those assets held in the name of the Bayou Funds.  Instead, based on the best available financial information, I considered all assets of the Fund and Non-Fund Entities known to me in order to take into consideration the commingling of assets between the Bayou Funds and Non-Fund Entities and among the bank and investment accounts of the various entities, the unwinding of which would probably not be possible and, at the very least, would be both prohibitively expensive and time consuming.

> ○    My NAV calculation does not make any provision for liabilities, such as, obligations to repay loans, any obligation to return funds to offshore entities, or, any accrued operating or other expenses.

_____

[6]    NAV may refer to a combined NAV for Bayou Funds, an individual investor's *pro rata* share, or the Fund And Non Fund Entities' assets used in the NAV calculation.

*Id.* at 6-7.   Lenhart's summary opinion is stated as follows:

> It is my opinion that, at all times during the Testing Period the Bayou Funds were insolvent on an adjusted balance sheet basis, were operating with inadequate capital, and did not have the ability to pay debts as they became due.   The Bayou Funds' insolvency during the Testing Period is most clearly demonstrated in Exhibit 4.

*Id.* at 7.

Section VII of the Report sets forth Lenhart's "Analysis and Conclusions."  In subsection 2 entitled "Application of Adjusted Balance Sheet Method," Lenhart sets forth at page 35 a table entitled "Bayou Funds Fair Value Adjusted Balance Sheets at December 31, 2002, 2003, 2004 and August 31, 2005."  This table, which I shall refer to as the "**Fair Value Adjusted Balance Sheets**," shows that the Bayou Fund and its successor Bayou hedge funds were insolvent during the entire period.

The "Excess (Deficit)" representing the amount by which "Investor Ending Balances (Contributions less Redemptions)" exceeded total Bayou entity assets, as reflected on the chart at page 35 of the Lenhart Report, was as follows:  for 2002 ($57,246,421); for 2003 ($120,557,826); for 2004 ($215,335,110); for August 31, 2005 ($218,745,730).  The **Fair Value Adjusted Balance Sheets** show that, even increasing the Bayou entity assets by "Total Other Items for Consideration" (discussed further under defendants' objections to admissibility, below), Bayou Fund and its successor Bayou hedge funds were insolvent to the extent of the following deficits:  for 2002 ($51,776,411); for 2003 ($117,960,120); for 2004 ($95,893,019); for August 31, 2005 ($108,388,100).   For convenience I shall refer to this latter set of deficit numbers as the "**Minimum Insolvency Figures**."

Lenhart's conclusion with regard to "Redemption Payments to Defendants" in Section B of Section VII was as follows:

> As discussed in the "Investor Activity/Balances" section of this Report, we calculated the *pro-forma* month-end balances for each investor based on their actual contribution and redemption data.  In place of allocating the fictitious periodic profits, I developed the approach of performing a *pro rata* allocation of the monthly change in the NAV to each investor to arrive at the *pro-forma* month-end balance for each investor. Exhibit 13 quantifies the results of this calculation for each Defendant.  It is my opinion that (1) each of the redemption payments made by the Bayou Funds to Defendants on or after May 30, 2004 was based on the Defendant's individual account balances as reported by the Bayou Funds to investors and was within 10% of "Members' Capital" as reported by the Bayou Funds in its fraudulent financial statements as at December 31, 2002, 2003 and 2004; (2) each such redemption payment was made based on a reported account balance for such Defendant that was inflated above what should have been the value of the Defendants' Bayou Funds' account and bore no relationship to the Bayou Funds' financial condition or value; and (3) each such redemption payment was made at the time when the Bayou Funds did not have sufficient assets to pay all of its investors their reported account balances or even repay their principle [sic] investments.  In fact, during my investigation, we were unable to uncover any information or accounting that justified or even attempted to justify the reported account balances for the Defendants used by the Bayou Funds to support the redemptions at issue in these Adversary Proceedings.

*Id.* at 37-38.

Lenhart's ultimate conclusion in Section VIII of the Report is as follows:

> It is my opinion that during the Testing Period, the Bayou Funds were insolvent on an adjusted balance sheet basis, were operating with inadequate capital, and did not have the ability to pay debts as they became due.  Furthermore, it is my opinion that each redemption payment was made based on a reported account balance for such Defendant

that was inflated above what should have been the value of the Defendants' Bayou
Funds' account and bore no relationship to the Bayou Funds' financial condition or
value.  Indeed, the amount that such payments were inflated is consistent with the values
reported to investors and the fraudulent financial statements.

*Id.* at 38.

It is important to note here that the defendants have not proffered any evidence to show
that the **Minimum Insolvency Figures** documented by Lenhart were wrong, much less that the Bayou
hedge funds were actually solvent at any time.  Of course, the burden is on plaintiffs to prove their case.
But as shown in point I, above, when the party moving for summary judgment has submitted evidence
documenting its *prima facie* case, the opposing party cannot rely on denials, self-serving arguments or
"metaphysical doubt," but must present "evidence on which the jury could reasonably find for [the oppos-
ing party]."  *Anderson*, 477 U.S. at 252.   Defendants have had ample opportunity to conduct their own
investigation, to conduct discovery and to submit evidence demonstrating that there is a genuine dispute
as to any of the findings and conclusions in the Lenhart Report.  But they have not tendered any such
evidence in opposing plaintiffs' motion for summary judgment with respect to Section 548(a) claims.

Based on the Lenhart Report and Exhibits, the Lenhart Declaration and Exhibits and the
failure of defendants to submit any evidence in support of an argument that there is a *bona fide* factual
dispute with Lenhart, I accept the findings and conclusions set forth in the Lenhart Report as established
in these adversary proceedings, and I conclude that the Bayou hedge funds were insolvent during the
relevant period to the extent of at least the **Minimum Insolvency Figures**.  Further, I conclude that each
redemption payment (i) was based on the inflated values reflected on the fraudulent financial statements,
reports and individual investor accounts and (ii) exceeded the amounts to which each redeeming investor
was contractually entitled.

2.    **Admissibility**

(a)    **Guilty pleas and allocutions**

The law is clear that the guilty pleas and allocutions of Israel, Marino and Marquez in evidence are admissible to prove the truth of their contents in these civil proceedings.   Guilty pleas and plea allocutions in criminal cases are admissible evidence in subsequent civil proceedings.   *See* Fed. R. Evid. 803(22) and 807.  While the general bar to hearsay evidence is defined in the "Hearsay Rule" of the Federal Rule of Evidence which states that "Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress," Fed. R. Evid. 802, applicable exceptions can be found in Rules 803(22) and 807 which provide as follows:

Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial

(22) Judgment of previous conviction. Evidence of a final judgment, entered after a trial or upon a plea of guilty (but not upon a plea of nolo contendere), adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, to prove any fact essential to sustain the judgment, but not including, when offered by the Government in a criminal prosecution for purposes other than impeachment, judgments against persons other than the accused.  The pendency of an appeal may be shown but does not affect admissibility.

* * *

Rule 807. Residual Exception

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.  However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

The cases so hold.  *See Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995)*, cert. denied sub nom.*

*African Enterprise, Inc. v. Scholes*, 516 U.S. 1028 (1995) (Ponzi scheme principal's admission of fraud in

criminal plea agreement is admissible evidence in subsequent fraudulent conveyance action to recover

from transferee "through hearsay, Fed. R. Evid. 803(22) . . ." (citations omitted)); *Bear, Stearns Sec.*

*Corp. v. Gredd* (*In re Manhattan Inv. Fund, Ltd.*), 2007 WL 4440360, at *8 (S.D.N.Y. Dec. 17, 2007)

("the criminal information to which [principal of a hedge fund] pled guilty" was recognized as "ample

support in the record [to establish the] characterization" of a Ponzi scheme in subsequent proceeding);

*American Int'l Specialty Lines Ins. Co. v. Towers Fin. Corp.*, 1997 WL 906427, at *4 n. 7 (S.D.N.Y.

Sept. 12, 1997) (". . . plea allocutions are admissible [against a third party in subsequent civil proceeding]

pursuant to Fed.R.Evid. 803(22), which makes non-hearsay '[e]vidence of a final judgment, entered after

trial or upon a plea of guilty . . . , adjudging a person guilty [of a felony], to prove any fact essential to

sustain the judgment . . .'" (citations omitted)).

        Courts have consistently found that criminal proceeding admissions of a fraudulent

scheme to defraud investors made in guilty pleas and plea allocutions are admissible as evidence of

"actual intent" to defraud creditors. *See Rosen v. Neilson* (*In re Slatkin*), 310 B.R. 740, 748 (C.D. Cal.

2004), *aff'd*, 222 Fed. Appx. 545 (9th Cir. 2007) ("*direct* evidence" of "actual intent to defraud" was

found in admission in plea agreement that transferor "executed a scheme to defraud approximately 800

investors throughout the United States of over $593 million, and to obtain money and property from such

investors by making and causing materially false statements to be made to such investors and by conceal-

ing material facts from them."); *Scholes v. Lehmann*, 56 F.3d at 762 (in a subsequent fraudulent convey-

ance action against a transferee, Ponzi scheme principal's admission of fraud in prior criminal plea agree-

ment was sufficient to establish liability); *Bauman v. Bliese* (*In re McCarn's Allstate Fin., Inc.*), 326 B.R.

843, 851 (Bankr. M.D. Fla. 2005) (actual intent to defraud is established ". . . if the allegations in the in-

formation establish that the debtor ran a scheme whereby the debtor intended to defraud the debtor's

creditors, evidence of a guilty verdict or plea agreement admitting the charges can establish the existence

of a Ponzi scheme. . . .   As the case law above recognizes, a debtor who runs a Ponzi scheme knows that

his future investors will lose their money and 'a debtor's knowledge that future investors will not be paid

is sufficient to establish his actual intent to defraud them.'" (citations omitted)); *Emerson v. Maples* (*In re Mark Benskin & Co., Inc.*), 161 B.R. 644, 648-49 (Bankr. W.D. Tenn. 1993) ("The debtors' intent to defraud creditors was established by the guilty pleas to the related criminal charges [including the scheme by principal and solely controlled company to defraud creditors] and preclusive effect may be given to those guilty pleas as factual findings to the extent that the debtors' intent to defraud creditors is required in this adversary proceeding.").

Defendants do not dispute the admissibility of the guilty pleas and allocutions.

### (b)   The Lenhart Report

Defendants have strenuously disputed the admissibility of the Lenhart Report in a motion to exclude, which I previously denied, and in opposing plaintiffs' motions for summary judgment. The following is a brief summary of defendants' objections to admissibility of the Lenhart Report and my reasons for overruling the objections.

● **Lenhart's qualifications**.   Lenhart's extraordinary qualifications detailed in his Report and annexed *curriculum vitae* speak for themselves and need not be recited here. Suffice it to say that he has practiced public accounting for over twenty-five years, has been designated a Certified Public Accountant, Certified Insolvency and Restructuring Advisor, Certified Turnaround Professional and Certified Fraud Examiner, has acted as a forensic accounting expert in many engagements, has wide experience in the field of insolvency, and has acted as a court-appointed examiner and an Independent Examiner approved by the Securities and Exchange Commission.

The fact that Lenhart had not previously been engaged to examine the solvency of a hedge fund in no way supports defendants' argument that he is not qualified to do so. There is nothing mystical or esoteric about a hedge fund which distinguishes it from other species of business and financial enterprise. The fundamental tasks here were to examine all of the available source documents and from these determine, quantify and correlate on an ongoing, month-by-month basis during the Testing Period the universe of assets of all of the Bayou entities; the universe of liabilities of the Bayou hedge funds

against which the total assets are to be measured (which in this case consisted solely of the principal contributed by the investors in the Bayou hedge funds net of redemptions); the inflated NAVs as reported in the fraudulent financial statements and other periodic reports disseminated by Bayou Management; and the amounts paid out by the Bayou hedge funds to investors who redeemed their investment accounts.

Lenhart's credentials as reflected in his *curriculum vitae* and his work product as reflected in the Report, the Declaration and the Exhibits thereto amply support the conclusion that it would be difficult to find a better qualified expert to perform these tasks of compilation, correlation and analysis.

● **Lenhart Report unsworn**.  Defendants argue that the Lenhart Report is not admissible as evidence because it was unsworn.  The Lenhart Report was signed by Lenhart, set forth in detail his findings and conclusions, identified the source documents upon which he relied and included his *curriculum vitae*, in accordance with the requirements of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.  Defendants had a full and fair opportunity to, and did, conduct a deposition of Lenhart under oath in which he repeatedly endorsed the Report and responded to all questions concerning it.  Lenhart signed and submitted his Declaration "under penalty of perjury" dated May 12, 2008, in which he stated "I affirm that the Expert Report and the deposition testimony I gave related thereto were truthful at the time given and continue to be true and accurate, subject to this declaration ('Declaration'), which in no way impacts the conclusions or opinions as set forth in my original Expert Report.  I further affirm that the information in this Declaration is also true and accurate."

If Lenhart's failure to sign the Expert Report subject to the penalties of perjury could be deemed a defect, the defect was cured by his subsequent deposition and Declaration.  *See Maytag Corp. v. Electrolux Home Prods., Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006) ("This Court concludes that subsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment."), *aff'd* 224 Fed. Appx. 972 (Fed. Cir. 2007); *Capobianco v. City of New York*, 422 F. 3d 47, 55 (2d Cir. 2005) ("Had [plaintiff] been given notice that [lack of verification] was an issue, [plaintiff] could have obtained an

affidavit easily, as Dr. Brodie had already been designated an expert and his expert report had previously

been produced."); *Straus v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620, 634 (S.D. Tex. 2007) (expert

report properly authenticated by a sworn declaration filed while summary judgment motion was pending).

- **Relevance**.  While defendants' other objections may fairly be characterized as trivial

or frivolous, the Sonnenschein Investors' argument that "The Lenhart Report is Not Relevant" (Memoran-

dum 13 *et seq.*) is simply incomprehensible.  Defendants may assert defects in the Report and disagree

with Lenhart's findings and conclusions, but it cannot be argued intelligibly that the Report is not "rele-

vant."  The argument concludes:

> The Lenhart Report . . . assumes insolvency using the facts, method and conclusions
> pulled together by Lenhart in support of the actual fraud claims.  There is, then, no
> legitimate report on insolvency or establishing otherwise the financial elements of
> constructive fraud.

*Id.* at 15.  To the contrary, the Lenhart Report does not "assume" insolvency — it **proves** insolvency

using the actual financial data derived from all available source documents to show both actual assets and

actual amounts invested.  Further, by contrasting the actual value of the Bayou entities' assets with the

NAVs of the Bayou hedge funds as fraudulently represented by Bayou Management, and by comparing

the redemption payments with the redeeming investors' fraudulently inflated account statements and cor-

respondingly fraudulently inflated NAVs for the various funds, the Lenhart Report demonstrates the

existence of both actual fraud and constructive fraud during the Testing Period and confirms the actual

fraud confessed by Israel, Marino and Marquez in their guilty pleas and allocutions.  These are precisely

the issues raised by plaintiffs' claims in these adversary proceedings.  It is ludicrous to say that the Report

is not relevant.

- **Methodology**.  Defendants acknowledge that "[t]he Lenhart Report invokes the

standard methodology for determining solvency."  Sonnenschein Investors' Exclusion Memorandum at

16.  But they argue that the Report "fails to apply it and/or fails to apply it in accordance with other

experts in this area."  *Id.*

A purported example of failure to apply proper methodology is the argument that "Lenhart does not go through the exercise of reconstructing a balance sheet reflecting assets and liabilities of the plaintiff at fair valuation at the time of the transfer." *Id.* at 17.  This assertion ignores the **Fair Value Adjusted Balance Sheets** and is contradicted in the very next sentence of the Memorandum which states that "the Lenhart Report aggregates cash balances for select bank and brokerage accounts with Reconstructed Account Balances and assets held by Bayou Fund Affiliates (valued at cost) on a month by month basis, and then sets off against that amount the aggregate full principal amount of investor contributions less redemptions that month to come up with a negative balance." *Id.*  The fact is that Lenhart's balance sheet approach is quite conventional, aggregating all assets (cash and investments) of all the Bayou entities (not just the Bayou hedge funds) and balances total assets thus determined against liabilities (but only tort liabilities based upon investors' capital contributions, excluding any other liabilities), which showed that assets so determined exceeded liabilities so determined.

Defendants erroneously argue that Lenhart's conclusions were "built upon a proof of cash process, not on the balance sheet test." *Id.* at 16.  In fact, Lenhart validated the actual Bayou NAVs by performing a "proof of cash" test to ensure that he had accounted for all of Bayou's assets during the relevant period.  In this regard, he analyzed and accounted for all significant inflows of cash to verify that Bayou did not liquidate any assets it had held during the relevant period but which were left out of Lenhart's NAV calculations, and thus he was able to conclude that he had accounted for all of Bayou's assets.  Lenhart's "proof of cash" method was a balance sheet test.  Lenhart's method was to identify and account for all of Bayou's assets, which were compared to Bayou's tort liabilities to investors.  This comports with the defendants' own articulation of a balance sheet test as a test of "whether the debtor's assets were greater than the debtor's liabilities." *Id.*

The defendants complain about the Lenhart Report's consolidation of the Bayou assets and liabilities.  Because the Bayou entities commingled assets and failed to respect the corporate form, the Lenhart Report conservatively included all known assets of all of the Bayou entities when calculating Bayou's NAV for each month, even though the liability to repay unredeemed investor principal only be-

longed to the specific Bayou hedge fund.  Defendants assert that Lenhart "paid lip service to substantive

consolidation" by consolidating the debtors' assets and liabilities "when it was helpful to his case" and by

keeping "them separate when it was not helpful to consolidate."  *Id.* at 24.  Specifically, defendants argue

that Lenhart "made no attempt to consolidate the assets of the principals although it was clear that they

were obtained with cash from the Bayou Funds."  *Id.*  However, the defendants have not identified any

of these assets that were allegedly "obtained with cash from the Bayou Funds" (other than the $120

million wired overseas) or provided any reason to believe that, even if they exist, they were not simply

stolen from Bayou and hence could no longer be included on Bayou's balance sheet under Bankruptcy

Code Section 101(32)(A)(i).

As amplified below, to the extent that the exclusion of a major item (the $120 million

wire transfer to Europe) or the valuation at cost of certain assets (certain private equity investments)

involved an exercise of professional judgment, the assets and issues were fully disclosed in the Report

and the Declaration and fully accounted for in the line item for "Other Items for Consideration" on the

**Fair Value Adjusted Balance Sheets**.

Another methodology plaint is the argument that "the treatment of the investor contribu-

tions as liabilities through the Report, rather than as equity, is a departure from the standard methodol-

ogy."  *Id.* at 17.  Of course, in an ordinary corporate balance sheet solvency analysis equity interests in

the corporation do not constitute liabilities and are not treated as such on the balance sheet.  But the

Bayou hedge funds were not ordinary corporations, the tort liability of the Bayou hedge funds to their

investors based upon rescission for fraud was not analogous to shareholder equity interests in a corpora-

tion, and this was not an ordinary corporate solvency analysis.  Unlike a corporation which has no liabil-

ity to its shareholders, it is a given in these adversary proceedings (which both sides must and do ac-

knowledge) that the Bayou hedge funds had a legal tort liability to their investors for the full amount of

their investments based on rescission for fraud.  As such, the investors were and are creditors.  *See*

*Bayou II*, 372 B.R. at 664-665.  The purpose of the Lenhart solvency analysis was precisely to determine

whether the Bayou hedge funds' liability to their investors was backed by assets.

The defendants take issue with the fact that Lenhart allegedly failed to utilize generally-accepted accounting principles ("GAAP") at various points in his Report. Putting aside the fact that the Report generally does utilize GAAP, "the law does not require compliance with generally accepted accounting principles in performing a solvency analysis." *Sharp v. Chase Manhattan Bank USA, N.A. (In re Commercial Fin. Servs.)*, 350 B.R. 520, 539 & n.15 (Bankr. N.D. Okla. 2005). Even the defendants' own expert, who takes issue with Lenhart's failure to use GAAP, has previously testified that GAAP is immaterial to the question of solvency. *See Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest.)*, 337 B.R. 495, 507 (Bankr. S.D.N.Y. 2006) ("Kranzler testified that GAAP was immaterial to the question of solvency"). *Cf.* Kranzler Report at 7-8.

Lenhart did, in fact, depart from standard methodology in several respects, but all such departures had the effect of overstating net asset values or understating liabilities. For example, Lenhart included not only assets held in accounts in the name of the Bayou hedge funds, but also assets held in the name of all other Bayou entities; Lenhart excluded all liabilities of the Bayou hedge funds and the other Bayou entities other than the Bayou hedge fund tort liabilities to investors for rescission of amounts invested; Lenhart included in assets $37 million in cash from investors in the Bayou offshore hedge funds without reducing the asset by a corresponding liability to the offshore funds.

In short, there is no basis to exclude the Lenhart Report on the ground of any deviation from standard accounting analysis or methodology.

- **No investigation**. Defendants complain that Lenhart and his firm BDO did not conduct an independent investigation concerning such matters as the $120 million wired to a PostBank account in Germany in July 2004, or what happened to $20 million of $120 million, or to locate other possible assets of the Bayou entities. It is argued that "[g]iven the absence of a true investigation into the assets of the Bayou Funds, it is impossible to determine at this stage and on this record whether the misrepresentations were 'material.'" Freestone Memorandum at 10. The short answer to these contentions is that Lenhart was not hired to conduct an investigation. The task assigned to and performed by Lenhart and BDO was to review and analyze all of the known source materials documenting the assets and liabili-

ties of all the Bayou entities.  This they did.  It is and has always been in the interests of the plaintiff

Bayou hedge funds, their creditors and all of the defendants in these adversary proceedings to investigate

and discover any and all assets of any of the Bayou entities for distribution to the defrauded investors/

creditors.   But Lenhart and BDO were not retained to do that.   The fact that they did not conduct an

independent investigation to discover or track assets not reflected in the compendious source documents

of these debtors does not render the Report which they were commissioned to prepare inadmissible.

- **Third-party litigation claims**.  Defendant Freestone argues that the Lenhart Report

erroneously "failed to include as assets the claims against earlier redeemers and partial redeemers on the

same legal theories as those brought against the current defendants," and omitted a claim asserted in an

adversary proceeding (removed to the District Court and now in arbitration) against the successor-in-in-

terest to Spear, Leeds & Kellogg, which served as a broker-dealer on behalf of the Bayou hedge funds

(the "SLK claim").  The fraudulent conveyance claims against redeeming investors asserted in these ad-

versary proceedings are expressly excluded from assets for the purpose of determining insolvency under

Section 101(32)(A)(i) of the Bankruptcy Code.   The SLK claim may or may not be meritorious, but there

was no basis for Lenhart to include as an asset for determining solvency such a claim asserted years after

the relevant Testing Period.   Moreover, the SLK claim, asserted in the gross amount of $20 million,

would not materially affect the **Minimum Insolvency Figures**.

- **The $120 million transfer**.  Lenhart describes at pages 30-31 of his Report the wire

transfer of $120 million derived from various Bayou entity accounts to an account in PostBank, Germany,

in the name of Israel, the subsequent transfers of these funds among several accounts in Europe and the

ultimate transfer of approximately $100 million back to the United States to a Wachovia bank account in

New Jersey in the name of Majestic Capital Management, which funds were then seized by the State of

Arizona and ultimately turned over to the United States Department of Justice.  It appears that there is no

explanation for the missing $20 million.  The Report explains the reasons for Lenhart's conclusion that no

part of these funds should be included in the assets of the Bayou entities, including the FBI investigation

and the fact that after the July 2004 transfer to PostBank there is no Bayou entity that records any part of these funds as a Bayou asset on any accounting or other document.

Despite the apparent misappropriation of this $120 million by Bayou Management, defendants argue based on certain documentary evidence that the $120 million or $100 million should be included as part of the Bayou assets for purposes of the solvency analysis. While the evidence would appear compelling that the $120 million transfer constituted a misappropriation by the Bayou principals, the issue is moot and need not be resolved. As reflected in the **Fair Value Adjusted Balance Sheets** at page 35 of the Lenhart Report, $100 million of the $120 million *was included* in the Bayou assets in the line item designated "Total Other Items for Consideration." With this inclusion, the net deficit for 2004 was $95,893,019, and the net deficit for 2005 was $108,388,100 (referred to herein as the **Minimum Insolvency Figures**).

• **Valuation of illiquid private equity investments**. Defendants argue that Lenhart either undervalued or did not ascribe any value to certain private equity investments made by the Bayou hedge funds. The investments were illiquid because they consisted of unregistered securities. As noted by plaintiffs, the amounts of funds invested by the Bayou entities in these private equity investments amounted to some $14 million through July 2004, increased to approximately $20 million at the end of 2004 and increased to $34 million by July 2005. Defendants also take issue with certain earlier-acquired investments of the Bayou hedge funds, including investments in KFX, Nestor, Inc., Waste Systems International, Inc. and certain alleged "missed trades conducted by Patterson Securities throughout 2002."

No purpose would be served by addressing the generalized contentions asserted by defendants in respect of these various assets. Suffice it to say that Lenhart has addressed in detail in his Report and Declaration every investment asset of the Bayou entities, including but not limited to those mentioned in defendants' objections, and has comprehensively explained the treatment of those assets in the Lenhart Report and refuted all of defendants' objections. In appropriate cases Lenhart has revalued certain assets and included the increased valuations in the line item "Total Other Items for Consideration" on the **Fair Value Adjusted Balance Sheets**, thereby reducing the net deficits to the **Minimum**

**Insolvency Figures**.   Despite the reductions in the deficits, the **Minimum Insolvency Figures** demon-

strate that the Bayou hedge funds were nevertheless insolvent by substantial amounts throughout the

Testing Period.

> ●   **Reliability**.   The Lenhart Report is in essence no more nor less than a compilation

and calculation of (i) the actual values of the Bayou entities' assets, which were compared with the

amount of the investors' unredeemed principal invested to produce the actual deficits of Bayou, and (ii)

the fraudulent NAVs reported by Bayou Management, which were correlated with the inflated amounts

paid to the redeeming investors.  As such, the Lenhart Report's methodology is fundamentally unassail-

able — there is simply no other way to go about determining the facts than that described in the Lenhart

Report.

In accomplishing their task, Lenhart and BDO examined **all** available source documents,

including the books and records of all of the Bayou entities and all third-party source documents includ-

ing bank account and brokerage account records for the Bayou entities, to determine the actual NAVs.

The applicable Federal Rule of Evidence for this task is Rule 1006, entitled

"Summaries," which provides:

> The contents of voluminous writings, recordings, or photographs which cannot
> conveniently be examined in court may be presented in the form of a chart, summary, or
> calculation.  The originals, or duplicates, shall be made available for examination or
> copying, or both, by other parties at reasonable time and place.  The court may order that
> they be produced in court.

There can be no question that the compilations and summaries which comprise the Lenhart Report are

appropriate and proper under Rule 1006, and plaintiffs complied with the second sentence of this Rule.

The volume of the source documents, the scope and breadth of the task, and the import-

ance of the knowledge and experience of an expert such as Lenhart and the staffing and resources of his

firm BDO certainly made it appropriate to retain Lenhart as an expert and present his conclusions in the

form of an Expert Report, thereby invoking Federal Rule of Evidence 702, entitled "Testimony by Ex-

perts."   Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

There can be no question that the requirements of Rule 702 have been complied with.

(1)    The Lenhart Report is not only "based upon sufficient facts or data," it is based upon and comprehends **all** the available facts and data with respect to the assets of the Bayou entities and the tort liabilities of the Bayou hedge funds in respect of rescission claims for amounts invested by the investors.

(2)    The Lenhart Report is "the product of reliable principles and methods" for determining the solvency of the Bayou hedge funds in accordance with the traditional, recognized methods for determining solvency, namely, the adjusted balance sheet test, the insufficient capital or assets test and the inability to pay debts as they become due test.

(3)    Lenhart "has applied the principles and methods reliably to the facts of the case." In this case, reliability is assured by Lenhart's identification of the source documents, complete and thorough explication of his methodology with full disclosure of all matters involving the exercise of professional judgment, and the fact that defendants have had ample opportunity to depose Lenhart, conduct their own examination of the source documents and investigation to identify other assets and grounds for objection.

At the end of the day, the fact is that the defendants have not identified a single asset of the Bayou hedge funds or, indeed, any of the Bayou entities, which has been overlooked by Lenhart. Nor have the defendants identified any mistakes or errors of calculation or omission in the Lenhart Report or the Exhibits thereto. With respect to defendants' objections to Lenhart's valuations of particular assets, Lenhart has fully and adequately explained in the Report and in the Declaration his reasons for the treat-

ment of every single asset questioned by defendants.  In the case of certain questioned assets, Lenhart has

included the asset (*viz*, the $120 million wire transfer) and included revised values of other assets in the

"Total Other Items for Consideration," resulting in reduced deficits but nevertheless very substantial

**Minimum Insolvency Figures**.

Although they have had ample opportunity to do so, the defendants have made no show-

ing of any valid basis to object to the **Minimum Insolvency Figures**.  Defendants' objections to admis-

sibility of the Lenhart Report are overruled.

C.     No triable issues of fact

In opposing summary judgment on plaintiffs' actual and constructive fraudulent convey-

ance claims under Section 548(a), defendants have not tendered any evidence giving rise to any dispute of

material fact requiring a trial.  Indeed, defendants have not even argued that a trial is required to decide

the Section 548(a) claims.  At the oral argument on these motions for summary judgment, I pressed

defense counsel to state whether there is need for a trial on the Section 548(a) claims and, if so, what evi-

dence they would present.  Counsel could identify no dispute and no evidence they would seek to present,

other than a desire to cross-examine Lenhart on the matters covered by defendants' objections to

admissibility of the Lenhart Report.  But Lenhart was examined by defense counsel at length at his depo-

sition, and the transcript is available to all.

In short, plaintiffs' actual and constructive fraudulent conveyance claims under Sec-

tion 548(a) are ripe for determination on the record now before the Court.

D.     Ultimate findings and conclusions

1.     Actual fraud under Section 548(a)(1)(A)

Each redemption payment to defendants constituted a "transfer" within the meaning of

Section 548(a).  The only question is whether each such transfer was made "with actual intent to hinder,

delay, or defraud" present or future creditors.

The guilty pleas and allocutions of Israel, Marquez and Marino establish that Bayou

Management "made up numbers" and knowingly and intentionally caused to be published weekly,

monthly, quarterly and annual reports containing falsely inflated earnings and NAVs for the Bayou hedge funds and individual investor accounts, with the intent and purpose of deceitfully inducing present investors to retain their accounts and prospective investors to invest.

Defendants' contention that plaintiffs have not proved that each transfer was made with the requisite intent is refuted by the Lenhart Report and by common sense. The Lenhart Report has established on a month-by-month basis that the Bayou entities, and *a fortiori*, the Bayou hedge funds, were insolvent during the entire Testing Period from January 2002 through August 2005. Defendants have offered no evidence and no argument that any of the Bayou hedge funds was solvent at any time during the Testing Period. The Lenhart Report demonstrates that the periodic reports and individual investor account statements published by Bayou Management falsely represented inflated earnings, NAVs and investor account balances, including representations of fictitious profits despite the fact that the Bayou hedge funds did not earn profits. Finally, the Lenhart Report establishes that the redemption payments corresponded precisely to the fraudulently inflated account statements for the redeeming investors.

Since Israel and Marino confessedly knew that the investor account statements were inflated, why would they authorize redemption payments they knew exceeded the redeeming investors' contractual entitlements, thereby exacerbating the insolvency and the damage to other investors? The answer is self-evident. It was essential to honor every request for redemption in accordance with the investor's expectation based upon the investor's falsely inflated account statement, because failure to do so would promptly have resulted in demand, investigation, the filing of a claim and disclosure of the fraud. Consequently, every redemption payment *in and of itself* constituted an intentional misrepresentation of fact with respect to the redeeming investor's redemption rights based on the investor's falsely inflated account statement. Redemption payments consistent with the fraudulent investor account statements were an integral and essential part of the Bayou fraud.

The conclusion is inescapable that corrupt Bayou Management authorized the fraudulently inflated redemption payments with "actual intent to hinder, delay, or defraud" because there cannot be any other explanation for Israel and Marino to authorize redemption payments in amounts to which

they knew the redeeming investors were not contractually entitled and which deepened the insolvency

and damaged the remaining investors.

I conclude that plaintiffs have established their *prima facie* case entitling plaintiffs to

summary judgment against all defendants for the full amount of all redemption payments, subject to

defendants' affirmative defenses under Section 548(c).  The affirmative defenses, which are addressed

under point III, below, apply only to that portion of redemption payments constituting defendants' capital

investments and do not affect plaintiffs' right to judgment under Section 548(a)(1)(A) with respect to

fictitious profits.

## 2.    Constructive fraud under Section 548(a)(1)(B)

Plaintiffs have also established all the statutory elements entitling them to judgment

against all defendants under Section 548(a)(1)(B) in respect of those portions of redemption payments

limited to fictitious profits.  As to each transfer of fictitious profits, each Bayou hedge fund "(i) received

less than a reasonably equivalent value in exchange for such transfer," and each fund "(ii)(I) was insol-

vent on the date that such transfer was made."

Redemption payments in respect of fictitious profits are not subject to the affirmative

defense under Section 548(c), because the 548(c) defense applies only "to the extent that such transferee .

. . gave value to the debtor in exchange for such transfer."

## III.    Section 548(c) issues and conclusions

### A.    The statute and case law

Once the plaintiffs have established their fraudulent conveyance claims under

Section 548(a), the burden shifts to the defendants to allege and prove facts to establish their affirmative

defense under Section 548(c).

The "value/good faith" affirmative defense to a fraudulent conveyance claim established

under Section 548(a) is set forth in subsection (c).   Section 548(c) provides as follows:

(c) . . . [A] transferee or obligee of such a transfer or obligation that takes for value and in
good faith has a lien on or may retain any interest transferred or may enforce any obli-

gation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

Under this provision, a transferee (redeeming Bayou investor) may retain the transfer (the redemption payment) if both of two conditions are met: (i) if the transferee "takes for value . . ." but only "to the extent that such transferee . . . gave value to the debtor in exchange for such transfer;" and (ii) if the transferee "takes . . . in good faith."

The "value" condition of the 548(c) defense is not in issue in these proceedings.   That is because all of the defendants aver (as they must to establish the 548(c) defense) that they were entitled to the tort claim of rescission to recover 100% of the amount of their Bayou investments based upon the pervasive and continuing Bayou fraud which induced their investments in the Bayou hedge funds.  For their part, plaintiffs do not (and cannot) contest the defendants' rescission claims having alleged and proved (as shown above) the existence of the pervasive and continuing Bayou fraud in order to establish their fraudulent conveyance claims under Section 548(a).

The "good faith" condition of the 548(c) defense is hotly contested as a matter of fact, although not as a matter of law.   The Bankruptcy Code does not define "good faith."  Thus, to determine what it means to say that a transferee "takes [a redemption payment] in good faith" one must look to the case law.

There is no real dispute between the plaintiffs and defendants as to the relevant case law construing the "good faith" defense under Section 548(c), nor are there materially conflicting views expressed in the reported decisions.  It will be useful to quote in full the case law summary set forth at pages 46-51 of plaintiffs' Omnibus Memorandum because it reflects plaintiffs' view of the law to which none of the defendants has taken material exception.

The Bankruptcy Code does not define "good faith" as used in section 548(c). *Jobin v. McKay (In re M & L Bus. Machine Co., Inc.)*, 84 F.3d 1330, 1335 (10th Cir. 1996); *Holber v. Dolchin Slotkin & Todd, P.C. (In re Am. Rehab & Physical Therapy, Inc.)*, 2006 WL 1997431, at *19 (Bankr. E.D. Pa. May 18, 2006).  Moreover, "the legislative history related to section 548(c) never defines, and scarcely addresses, good faith."  *Id.* at *19 n.21.  (quotation marks and citation omitted).

Nevertheless, federal courts have reached a consensus that "good faith" as used in section 548(c) must be determined according to an "objective" or "reasonable person" standard, and not on the subjective knowledge or belief of the transferee. *In re Manhattan Inv. Fund*, 2007 WL 4440360, at *17; *Enron Corp. v. Avenue Special Situations Fund II, L.P. (In re Enron Corp.)*, 340 B.R. 180, 207 (Bankr. S.D.N.Y. 2006), *rev'd on other grounds,* 2007 WL 2446498 (S.D.N.Y. Aug. 27, 2007); *see also Warfield v. Byron*, 436 F.3d 551, 559-60 (5th Cir. 2006) (analyzing analogous provision under Uniform Fraudulent Transfer Act); *Jobin v. McKay*, 84 F.3d at 1337-38 (10th Cir. 1996); *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1355 (8th Cir. 1996); *In re Agric. Research and Tech. Group, Inc.*, 916 F.2d at 535-36 (recognizing that UFTA provision is interpreted same as § 548(c)); *Terry v. June*, 432 F. Supp. 2d 635, 641 (W.D. Va. 2006) (analyzing analogous provision under UFTA).

Under this objective standard, "subjective assertions of good faith . . . are of no moment." *In re Agric. Research and Tech. Group*, 916 F.2d at 536. Instead, "courts look to what the transferee objectively 'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint." *Id.* at 535-536; *see also In re Enron Corp.*, 340 B.R. at 208 n.25 (same).

Accordingly, a transferee cannot be found to have taken a transfer in good faith "if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose." *Jobin v. McKay,* 84 F.3d at 1338 (quoting *In re Agric. Research and Tech. Group, Inc.*, 916 F.2d at 536) (internal citations omitted) (emphasis in original); *see also Banner v. Kassow*, 104 F.3d 352, 1996 WL 680760, at *3 (2d Cir. Nov. 22, 1996) ("transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible solvency [*sic* – should read "insolvency"]"); *Terry v. June*, 432 F. Supp. 2d at 641 ("the transferee must show not that he was subjectively unaware of the transferor's fraudulent intent, but rather that he did not have knowledge of facts that should have reasonably put him on notice that the transfer was made in order to delay, hinder, or defraud creditors of the debtor").

In an opinion published just last month, District Judge Buchwald confirmed the law in this District that statutory "good faith" requires either that: (1) the transferee was not on "inquiry notice" or (2) if on notice, the transferee was "diligent in its investigation" of the transferor. *In re Manhattan Inv. Fund Ltd.*, 2007 WL 4440360, at *17. As Judge Buchwald made clear, a transferee may be on "inquiry notice" without actual knowledge of a fraud or other circumstance. *Id.* at *17. Rather, a transferee is on "inquiry notice" if it knew or should have known of information placing it objectively "*on alert that there was a potential problem with the Fund*" such that the transferee "should have attempted to learn more." *Id.* at *17 (emphasis added). As Judge Buchwald recognized, the "support for a finding of inquiry notice is found in [the transferee's] own reaction" to the information it learned. *Id.* at *17. Whether a transferee was on "inquiry notice" may also be informed by, *inter alia*, the experience or sophistication of the transferee. *Jobin v. McKay,* 84 F.3d at 1338.

Courts have held that "inquiry notice" of a variety of circumstances precludes a finding of good faith, including "inquiry notice" of the:

- **Fraudulent purpose of the transfer**. *In re Agric. Research and Tech. Group, Inc.*, 916 F.2d at 535*; Terry v. June*, 432 F. Supp. 2d at 641.

- 37 -

- ● **Underlying fraud.**  *In re Manhattan Inv. Fund*, 2007 WL 4440360, at *17; *Cuthill v. Kime (In re Evergreen Sec., Ltd.)*, 319 B.R. 245, 255 (Bankr. M.D. Fla. 2003) ("Circumstances putting the transferee on inquiry notice as to . . . an underlying fraud . . . will preclude a transferee from asserting a good faith defense.").

- ● **Unfavorable financial condition of the transferor.**  *Jobin v. McKay*, 84 F.3d at 1335-36 ("the presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment") (quotation marks and citation omitted); *In re Enron Corp.*, 340 B.R. at 207 (transferee does not act in good faith if it knew or should have known of "unfavorable financial condition at the time of the transfer").

- ● **Insolvency of the transferor.**  *In re Sherman*, 67 F.3d at 1355; *Kassow*, 104 F.3d 352, 1996 WL 680760, at *3.

- ● **Improper nature of a transaction.**  *In re Evergreen Sec., Ltd.*, 319 B.R. at 255 (Bankr. M.D. Fla. 2003) ("Circumstances putting the transferee on inquiry notice as to . . . the improper nature of a transaction will preclude a transferee from asserting a good faith defense.").

- ● **Voidability of the transfer.**  *In re Am. Rehab & Physical Therapy, Inc.*, 2006 WL 1997431, at *19 ("a transferee does not act in good faith when it has sufficient knowledge to place it on inquiry notice of the voidability of the transfer").

These enumerated circumstances, however, are not exhaustive and thus "good faith" must be evaluated on a case-by-case basis.  *In re Sherman*, 67 F.3d at 1355; *Jobin v. McKay,* 84 F.3d at 1335 ("courts applying § 548(c) have generally refused to formulate precise definitions" of good faith); *In re Agric. Research and Tech. Group, Inc.*, 916 F.2d at 536 ("good faith is not susceptible of precise definition") (internal quotation marks and citations omitted); *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 230 B.R. 546, 592 (Bankr. W.D. Tenn. 1999) ("Courts have found good faith lacking in a wide variety of circumstances."), *amended in part by,* 232 B.R. 701 (Bankr. W.D. Tenn. 1999), *rev'd on other grounds*, 2000 WL 34400479 (W.D. Tenn. Mar. 31, 2000); 5 *Collier on Bankruptcy* 548.07[2][a] at 548-60 (15th ed. 2007) ("The unpredictable circumstances in which the courts may find its presence or absence render any definition of 'good faith' inadequate, if not unwise.").

Once on inquiry notice, a transferee's failure to conduct a "diligent investigation" is fatal to its "good faith" defense.  In order to prove "good faith," that "diligent investigation" must ameliorate the issues that placed the transferee on inquiry notice in the first place.  *Jobin v. McKay,* 84 F.3d at 1335-36 ("the presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith ***unless investigation actually disclosed no reason to suspect financial embarrassment***") (quotation marks and citation omitted) (emphasis added).  In other words, if the diligent investiga-

tion aggravates, rather than allays, the concerns placing the transferee on inquiry notice, then no "good faith" defense is supported.

Moreover, a transferee cannot satisfy the "diligent investigation" prong of the "good faith" test merely by inquiring with the transferor itself, even were the transferor to provide a plausible explanation of the issues. As Bankruptcy Judge Lifland observed in his *In re Manhattan Investment Fund* decision, and Judge Buchwald agreed in her decision, a "diligent investigation" requires more than merely asking the transferor about the suspicious circumstances. *See Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund)*, 359 B.R. 510, 526 (Bankr. S.D.N.Y. 2007) (for diligent investigation, transferee is "required to do more than simply ask the wrongdoer if he was doing wrong"), *aff'd in part & rev'd in part, In re Manhattan Inv. Fund*, 2007 WL 4440360, at *19 (diligent investigation had to include something more than just speaking to hedge fund's principal, even where the principal's explanation of suspicious circumstances was "not only facially plausible, but also comforting").

In other words, a transferee cannot put his head in the sand in the face of unusual or suspicious circumstances and then take advantage of the "good faith" defense afforded by section 548(c). As Judge Buchwald noted in *In re Manhattan Inv. Fund*, once on inquiry notice, "taking no steps at all would have amounted to 'willful ignorance,' which would have defeated the good faith defense." 2007 WL 4440360, at *19 n. 39; *see also Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 798 (Bankr. S.D. Fla. 2000) ("The mere failure to make inquiry in the face of unusual circumstances [] is sufficient to preclude a good faith defense."); *In re Cannon*, 230 B.R. at 592 ("courts have found mere failure to inquire in the face of unusual circumstances to be sufficient" to find lack of good faith); *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995) (under New York state law equivalent to section 548(c), "[c]onstructive knowledge of fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, ***but who failed to make such inquiry***") (emphasis added).

Plaintiffs' Omnibus Memorandum of Law at 46-51; emphasis as in the Omnibus Memorandum.

I agree with plaintiffs' exposition of the case law and have endeavored to apply the precedents as relevant to the disparate facts in these adversary proceedings. The parties' dispute lies in the application of the case law to the particular facts for each defendant or group of defendants. Before turning to the facts, however, it is important to set forth this Court's views on certain aspects of the law which have informed my conclusions as to each defendant, since my views may be thought to differ in some respects from the case law (*e.g.*, the "objective/subjective" dichotomy discussed below).

It should be noted first that the concept of "good faith" embodied in Section 548(c) is somewhat different from the traditional notion of good faith as the term is customarily used by laymen. In common parlance, the term "good faith," as distinguished from its counterpart "bad faith," denotes a

- 39 -

conformity with accepted standards of integrity, trust and good conduct and the absence of any of the usual indicia of bad faith such as dishonesty, deceit, intent to harm or complicity in some form of wrong-doing.[7]   Consequently, to say that a person has *not* acted in "good faith," or in context here, that the person has not proved his defense of "good faith," might be thought to imply that the person's action in question was wrongful, improper or legally or ethically deplorable in some manner.[8]

But the narrow, layman's definition is not the meaning ascribed to Section 548(c) "good faith" by the case law, which looks to the broader meaning expressed in Black's Law Dictionary, quoted in footnote 8.   Where the rule of law holds that an investor may not be able to establish his statutory good faith defense because he requested redemption of his investment after becoming aware of a "red flag" putting him on "inquiry notice" of possible infirmity in his investment, that does not necessarily entail a finding or carry an imputation that he was guilty of any sort of *mala fides* or otherwise deserving of opprobrium.   To the contrary, any rational investor or financial advisor, on inquiry notice of a warning signal respecting an investment, would be entirely justified in requesting or recommending redemption and could not be criticized for doing so.   Indeed, it would be quite reasonable for an investor to decide to redeem solely on the basis of the red flag without making any inquiry, since the investor has no obligation to any third party to make any inquiry.   But if he does so, the courts have held that he cannot invoke the good faith defense under Section 548(c).

Thus, it is important for the trier of fact to understand that the test for good faith under Section 548(c) is not whether the defendant was guilty of any sort of bad faith in requesting and receiving the transfer.   The test is whether the defendant requested redemption after learning of a "red flag" which, under an "objective" standard, should have put the defendant on "inquiry notice" of some infirmity in

---

[7]   For example, the Random House Dictionary (1966) defines "good faith" as "accordance with standards of honesty, trust, sincerity, etc."

[8]   Note, however, that the definition of "good faith" in Black's Law Dictionary (1990) is much more comprehensive and includes "freedom from knowledge of circumstances which ought to put the holder upon inquiry" and "[a]n honest intention to abstain from taking any unconscientious advantage of another, even through technicalities of law, together with absence of all information, notice, or benefit or belief of facts which render transaction unconscientious."

Bayou or the integrity of its management.   The rule does not require that the "red flag" be of such specificity as to put the recipient on "inquiry notice" of the actual fraud, or embezzlement, or looting, or whatever ultimately proves to be the cause of loss.  It is sufficient if the red flag puts the investor on notice of some potential infirmity in the investment such that a reasonable investor would recognize the need to conduct some investigation.

The "diligent investigation" is required not because of any duty to inquire owed to a third party.  It is required only to prove the plausibility of the defendant's asserted good faith reason for redemption independent of the red flag, notwithstanding his knowledge of the red flag, by showing that the facts learned upon inquiry reasonably allayed any concern raised by the red flag.

The "objective" versus "subjective" dichotomy under the case law holds that "subjective assertions of good faith . . . are of no moment" and that "courts look to what the transferee objectively 'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint."  *In re Agric. Research and Tech Group, Inc.,* 916 F.2d 528, 535-536.   But what if a defendant on inquiry notice because of red flags goes ahead and redeems without conducting an inquiry which reasonably allays the concern raised by the red flag — does the objective test mean that a defendant's actual, subjective intent, purpose or state of mind is never relevant?  Stated differently, is a defendant barred as a matter of law from proving his actual good faith purpose in requesting redemption (*i.e.*, a purpose independent of and not motivated by a red flag warning signal) once it is shown that he had knowledge of "red flags" which would put the objective "reasonable man" on inquiry notice?   I would answer "no" to these questions, but only in the following limited circumstance.  Recognizing that the burden is on the defendant to prove his 548(c) defense, I would hold that a defendant may establish his defense if he can prove by a preponderance of the credible ***objective evidence*** that his request for redemption was in fact the result of a good faith reason other than his knowledge of "red flags," even if he was on inquiry notice and did not make inquiry before redeeming.  By "objective evidence" I mean independent evidence of facts, as opposed to mere "subjective assertions of good faith" by the defendant himself or the testimony of others that cannot be objectively verified.   An example of such limited cir-

cumstances may be seen in the *DB Structured Products* adversary proceeding discussed at Point III C 1, below, where it was perfectly clear that the investor redeemed for an objectively identifiable reason having nothing to do with any red flag warning.[9]

Therefore, while I maintain that an objective standard must be applied to the good faith analysis, to disregard **objective evidence** of the transferee's **subjective** good faith intent would fundamentally distort the concept of good faith.  *See, e.g., Moglia v. Universal Auto., Inc. (In re First Nat'l Parts Exch., Inc.)*, 2000 U.S. Dist. LEXIS 10420 at *19-25 (N.D. Ill. July 12, 2000) (finding that a good faith analysis should weigh both subjective good faith and the objective basis for that good faith).

Another issue raised by plaintiffs in respect of certain defendants here is whether knowledge of red flags acquired after a request for redemption undermines the defendant's good faith defense which was valid as of the date of the request.  Plaintiffs have argued that the statutory language "takes . . . in good faith" requires that good faith be determined as of the date the redemption payment is actually received.  It may perhaps be that on other facts in other contexts the issue of good faith could or should be determined as of the date the transfer is actually received.  But not here.  Under the Bayou investor agreements a written request for redemption is effective at the end of the month when made.  Although the redemption payment need not be made for an extendable period of time after the written request, the redeeming investor does not remain invested and subject to gains and losses in the fund after the month of the request to redeem.  If a defendant can prove that his request for redemption was not motivated by knowledge of a red flag portending infirmity within Bayou, that defense is not undermined by delays in payment or other post-request red flags.

A number of defendants have advanced what may be called the "futility argument," asserting that inquiry after notice of a red flag would have been futile because no amount of diligent investigation would have uncovered the Bayou fraud, citing the fact that the fraud was not discovered by the regulators, investment professionals or investors for years, and that the District Court, in dismissing a

---

[9]    As it happens, plaintiffs do not allege that this defendant was on inquiry notice by reason of a red flag.

Bayou investor's Section 10(b) Securities Exchange Act claim against its investment advisor, stated that "[o]ne substantial competing inference this Court may draw from these alleged facts is that due diligence would not have uncovered the fraud." *South Cherry Street LLC v. Hennessee Group LLC, et al. (In re Bayou Hedge Fund Litigation)*, 534 F. Supp. 2d 405, 418 (S.D.N.Y. 2007).[10] In the context of this case and the "good faith" defense under Section 548(c) of the Bankruptcy Code, defendants' "futility argument" must be rejected as a matter of fact and law.

In point of fact, defendants' argument that the Bayou fraud was impossible to detect obviously is wrong. As amplified in the facts sections below, simple diligence in the form of questions put to Israel and Marino with insistence on documented answers and access to source documents supporting the Bayou hedge funds' net asset values ("NAVs") and inquiry directed to Bayou's purported independent auditor would have and, in fact, did reveal that Richmond-Fairfield Associates was not an independent accounting firm, that Marino was the principal of Richmond-Fairfield, and that the Bayou principals alone determined the NAVs of the Bayou hedge funds without any independent review and verification. Even Bayou insiders were denied access to the Bayou books and records necessary to determine the NAVs,[11] and any request by an investor to have his own accountants examine the Bayou books and records had to be, and was, refused.[12] That refusal, and the fact that Richmond-Fairfield was not an independent accounting firm as falsely represented, perhaps did not reveal the scope and details of the fraud, but those readily ascertainable facts alone made quite apparent that there was misrepresentation in the published financials and some serious defect in the financial affairs of the Bayou hedge funds that could

---

[10] The District Court in *South Cherry Street* did not find as a fact that due diligence could not have uncovered the Bayou fraud. The issue in that case was whether the plaintiff Bayou investor had alleged a claim for fraud against its investment advisor, Hennessee Group, under Section 10(b) of the Securities Exchange Act of 1934. The complaint was dismissed for failure to allege scienter (intent to defraud) on the part of Hennessee Group. The Court's reference to a "competing inference" was made in the context of rejecting plaintiff's argument that the Court should infer the element of scienter based upon Hennessee Group's alleged "recklessness" in failing to discover the Bayou fraud.

[11] *See* point III E 2, below, discussing the *Westervelt* complaint.

[12] *See* points III E 1 and 3, below, concerning the Altegris and CSG investigations.

not withstand scrutiny.   Any person with access to the prime broker statements and the incentive and

ability to compare the source documents with the false financial statements published by corrupt manage-

ment would have discovered the fraud.

   Defendants' "futility argument" must also fail as a matter of law if it is offered somehow

to support a good faith defense.[13]   The rule of law formulated by the courts interpreting Section 548(c)

does not turn upon whether the investor-defendant could or should, or did or did not, actually discover the

fraud.  If a defendant had actual knowledge of the fraud, of course this would defeat good faith.  If he did

not have actual knowledge but received one or more "red flags" putting him on "inquiry notice" of pos-

sible problems with his Bayou investment, then, to prove his good faith, defendant had to conduct a dili-

gent inquiry reasonable under the circumstances.  If a defendant could show that the response to his in-

quiry was sufficient to allay his concerns and could persuade the trier of fact that his subsequent decision

to redeem his Bayou investment was motivated by some good faith reason other than the red flags

prompting his notice inquiry, such a defendant would presumably have sustained his burden of establish-

ing his good faith defense.  But to suggest that the good faith defense can be established, or that there was

no duty to make diligent inquiry, simply by arguing that discovery of the fraud was impossible does not

comport with the rule of law established by the decisions.

   One of the defendants who redeemed on the advice of their investment advisor CSG

(point III E 3, below) argued that CSG conducted a diligent investigation on its behalf and did not dis-

cover the fraud, and that this fact without more establishes the defendant's good faith affirmative defense

under Section 548(c).   The argument, which we may label for easy reference the "inconclusive diligent

investigation" argument, is as follows:

   The Plaintiff suggests throughout its Omnibus Memorandum of Law that a
diligent investigation that does not discover fraud is nevertheless insufficient to invoke
548(c) if the investigation does not "allow" [sic – should read "allay"] or "ameliorate"

---

  [13]  Oddly enough, the defendants do not identify what the legal consequences of the "futility argu-
ment" should be, or why it should be a defense, if that is their argument.  For example, if some
court or fact finder were to conclude somehow that some or any investigation could not have
uncovered the Bayou fraud, would that conclusion establish, or rebut, or be irrelevant to the
defendant's good faith defense?  Defendants do not explain.

any suspicions the defendant may have.  *See*, *e.g.*, Plaintiff's Memorandum of Law, pp. 49-50.

The case law does not so hold.  The standard as articulated by the courts is that a transferee does not take in good faith under 548(c) if a diligent investigation would have discovered fraud.

Christian Brothers High School Endowment's Memorandum of Law at 40.   In its Reply Memorandum,

the High School Endowment amplifies the position, arguing as follows:

As long as a transferee's diligent investigation does not uncover the transferor's actual fraud, a transferee's lingering concerns or suspicions will not vitiate its "good faith," nor is perfection required for an investigation to be diligent.

* * *

. . . It would be an almost impossible standard to meet as a defense to recovery of an actually fraudulent conveyance to require a transferee to be both (a) diligent in its investigation of what is in fact a fraud (indeed, because "good faith" is an affirmative defense, in every case under 548(a)(1)(A) in which the outcome turns on whether the transferee took in "good faith," the transferor by definition engaged in actual fraud) **AND** (b) have no lingering concerns or suspicions regarding the transferor and the transfer (as opposed to actually uncovering the fraud).   That is, it would virtually rescind the availability of the "good faith" defense to expect a transferee to conduct an investigation that is diligent but that at the same time leaves the transferee with no concerns or suspicions.

Christian Brothers High School Endowment's Reply Memorandum at 9.

The "inconclusive diligent investigation" argument misunderstands both the good faith

defense and the purpose for the "diligent investigation" and misstates the case law.   It bears repeating

that Section 548(c) provides for an affirmative defense, and the burden is on the defendant to prove that

defense.   In these adversary proceedings each defendant redeeming investor must prove that he took the

redemption payment "in good faith," *i.e.*, he demanded to take his investment out of the particular Bayou

fund **not** because he had some information that there was some infirmity in the fund, but because of some

other reason personal to him and extraneous to the well-being of the fund and its remaining investors.

The case law holds that the redeeming investor cannot sustain his burden to prove his good faith if the

evidence shows that he was on objective notice of some infirmity in the fund.   If he was on such inquiry

notice, he may nevertheless overcome the logical presumption that he redeemed because of the red flag

by proving that he conducted a diligent investigation which, judged under a "reasonable man" standard,

allayed or set to rest the concerns aroused by the red flag, thereby establishing the *bona fides* of his

proffered extraneous good faith reason for redeeming.

What the cases do **not** hold is that the defendant's good faith defense is established if the

investigation is not carried on to the point that it proves that there was a fraud.  As a practical matter, few

if any "inquiry notice" investigations will be carried on to the point of actually proving fraud.  Once the

investigation encounters evasion or stonewalling exacerbating the concerns caused by the original red

flag, the sensible investor will promptly redeem without spending more time and money on further in-

quiry.[14]

The "inconclusive diligent investigation" argument must be rejected because it is pre-

cisely the purpose and the effect of the objective approach adopted by all the courts in interpreting

Section 548(c) to "virtually rescind the availability of the 'good faith' defense [where the transferee or its

surrogate] conduct[s] an investigation that is diligent but that at the same time leaves the transferee with

[ ] concerns or suspicions."   This is especially so in a case where a defendant, such as the Christian

Brothers High School Endowment, asserts no extraneous reason at all for its decision to redeem other

than the CSG investigation and the reasons for CSG's recommendation to its clients to redeem.  *See*

point III E 5 (b), below, concerning the Christian Brothers High School Endowment.

As shown in point III E 3, below, the concerns that motivated CSG to investigate Bayou

as agent for its clients (the *Westervelt* complaint and the need to verify net asset values) were not set to

rest by the June 22 meeting, **they were compounded**.  CSG representatives did not actually uncover the

Bayou fraud at the June 22 meeting, although there can be little doubt that they could and would have

---

[14]    As a representative of the KFI-related defendants testified, "if you're not comfortable with [a
hedge fund] for whatever reason, you get out the next time you can, because what happens in the
hedge fund business is because these funds have gates — you don't want to be the last guy in line.
You want to be the first guy in line."  *See* point III E 5 (f), below.  The typical reaction to stone-
walling such as experienced by CSG with Bayou was expressed by two members of a Finance
Committee which advised the High School Endowment to redeem: "there is no acceptable reason
for Bayou to react as they have.  We need to get out as quickly as possible.  Yesterday is not soon
enough." and "we do not need to mess around with these characters."  *See* point III E 5 (b), below.
Similarly, Freestone decided to redeem "at the earliest date possible" after an "evasive" telephone
conference with Marino and was glad Freestone "had submitted our notice before other people, if
they were planning to redeem as well."  *See* point III E 7, below.

discovered the fraud if, like Altegris (points III E 1, below), they had pressed their inquiry to the next

logical step of insisting on interviewing the fictive Richmond-Fairfield, which was fraudulently repre-

sented to be the "independent auditor" of the Bayou hedge funds.  But what CSG did learn was that there

was some reason why Bayou management could not or would not provide the "transparency" which the

investors were contractually entitled to receive and Bayou was required to give.   CSG concluded, quite

understandably, that Marino's stonewalling at the June 22 meeting destroyed their trust in Bayou and

mandated their decision to redeem without the need for further investigation.   Any argument that such

facts establish a CSG's client's statutory good faith under Section 548(c) must be rejected as a matter of

fact and law.

> ### B.    Background:  good faith defenses accepted by plaintiffs

> #### 1.    Proceedings not settled

> **John Barr III IRA and John Barr III (Adv. Proc. No. 07-08244)**
> **Myrna Bennett (Adv. Proc. No. 06-08420)**
> **Madison Capital Advisors Ltd. (Adv. Proc. No. 06-08403)**

After conducting discovery, plaintiffs agreed that the defendants in these three adversary

proceedings had established their Section 548(c) good faith defenses by objective evidence and, accord-

ingly, plaintiffs have relinquished their claims against these defendants to recover redemption payments

of principal invested.  These adversary proceedings remain contested in respect of plaintiffs' claims to

recover redemption payments of fictitious profits.  In accordance with this Court's rulings under

points II D 1 and 2, above, plaintiffs are entitled to judgment against these defendants in respect of their

redemption payments limited to fictitious profits.

> #### 2.    Proceedings settled

After conducting discovery, plaintiffs settled, with Court approval, forty-five adversary

proceedings and two other potential claims against redeeming Bayou investors based on acceptance of

defendants' Section 548(c) good faith defenses.  The settlement agreements required the settling defen-

dants to repay to the plaintiffs the full amounts of fictitious profits received on redemption, but permitted

them to retain the full amounts of redemption payments of principal invested.

The following is a representative sample of such settlements illustrative of good faith

defenses under Section 548(c) established by objective evidence and not contested by the plaintiffs.

1.   UT Medical Group Pension Plan (Adv. Proc. No. 06-08292)   On advice of independent auditors and counsel, the Plan liquidated its Bayou investment and similar investments to comply with ERISA and the Plan's Trust Agreement.

2.   Singer 1995 Family Trust (Adv. Proc. No. 06-08371)  The Trust requested redemption for the sole purpose of funding the purchase of a home by the Trust's beneficiary.

3.   Dalsy Family Limited Partnership (Adv. Proc. No. 06-08397)  The Partnership was managed by Charles Lieb until his death in 2005.  Redemption was requested as part of liquidation of assets for transition of investment management and administrative matters in anticipation of Lieb's death.

4.   Steven R. Selcer (Adv. Proc. No. 06-08401)  Redemption was requested to fund expenses of a newborn child and private school tuition expenses of an older child.

5.   Keith Arroyo (Adv. Proc. No. 06-08425)  Arroyo requested only partial redemption of his Bayou investment.  The balance of the investment was returned to Arroyo and his account was closed by Bayou for falling below the minimum investment balance requested by Bayou.

6.   Trail Ridge Flatiron Fund, L.P. (Adv. Proc. No. 07-08247)  Trail Ridge, a fund of funds, made a partial redemption of its Bayou investment to satisfy redemption requests from its investors, to make payment on its loan from a bank and to reduce the size of its position in the Bayou fund.

7.   David and Ann Fristoe (Adv. Proc. No. 08-08228)   The Fristoes requested redemption in order to obtain funds to purchase a new home.

8.   LeBlanc Enterprises, Ltd. (Adv. Proc. No. 08-08246)  LeBlanc's money managers moved from Oppenheimer to UBS and advised LeBlanc that Bayou did not fit the UBS profile and thus was not part of the UBS investment platform.

## C.   Good faith defenses sustained

For the reasons stated below, I have concluded that cross-motions for summary judgment

for dismissal of plaintiffs' claims to recover redemption payments of principal invested should be granted

in the following three adversary proceedings based upon the defendants' good faith defenses asserted

under Section 548(c).  This does not affect plaintiffs' right to judgment against these defendants to re-

cover any redemption payments in respect of fictitious profits in accordance with this Court's rulings

under point II D 1 and 2, above.

### 1.    DB Structured Products, Inc. (Adv. Proc. No. 06-08494)

The material facts are not in dispute and, while somewhat complex, may be concisely

summarized.  The ultimate parent corporation of DB Structured Products, Inc. (together with its prede-

cessor in interest, "DBSP") was Deutsche Bank A.G. ("Deutsche Bank").  At the instruction of Deutsche

Bank, DBSP made two separate and independent investments in a Bayou hedge fund in connection with

two separate swap transactions entered into by Deutsche Bank.

In January 2002 Deutsche Bank entered into a swap transaction (the "Alerion Swap")

with the predecessor-in-interest to Alerion Strategies Holdings, Ltd. ("Alerion") wherein Alerion would

be exposed to the performance of various hedge funds including a predecessor of one of the Bayou hedge

funds.  Pursuant to the Alerion Swap, Deutsche Bank agreed to pay Alerion any increase that a hypothet-

ical investor would receive on an investment in the Bayou hedge fund, and Alerion agreed to pay

Deutsche Bank any loss that such a hypothetical investor would incur.  The terms of the Alerion Swap did

not require Deutsche Bank to make a direct investment in the Bayou hedge fund in question, but because

Deutsche Bank did not wish to take investment risk related to its customer's swap transactions, it elected

to hedge its risk in the Alerion Swap with a direct investment by its affiliated company, DBSP, in the

various hedge funds underlying the swap, including the particular Bayou hedge fund.  Thus, in con-

nection with the Alerion Swap as it was modified and increased from time to time, DBSP had directly

invested a total of $16,240,000 in a Bayou hedge fund as a hedge to its risk under the Alerion Swap by

the time of the Bayou collapse in August 2005.  Because the Alerion Swap was still outstanding as of

August 2005, DBSP never requested redemption of its investment in the Bayou hedge fund.

By agreements dated in July 2003 and thereafter Deutsche Bank entered into a separate

swap transaction (the "Total Return Swap") with a predecessor-in-interest to Sterling Stamos Levered

(Offshore) Fund, Ltd. ("Sterling Levered").  Sterling Levered, not Deutsche Bank or DBSP, determined

what funds Sterling Levered wished to be exposed to in the Total Return Swap.  Through the Total Re-

turn Swap, Sterling Levered obtained from Deutsche Bank synthetic exposure to the performance of

Bayou Superfund and several other non-Bayou funds.  Deutsche Bank was required to pay Sterling

Levered for any appreciation in the notional value of a hypothetical investment in Bayou Superfund, and

Sterling Levered was required to pay Deutsche Bank for any depreciation in the notional value of such

investment during the term of the Total Return Swap.  Although Deutsche Bank was under no obligation

to hedge its risk associated with the Total Return Swap, it directed DBSP to make a direct investment in

Bayou Superfund as a hedge against Deutsche Bank's Total Return Swap exposure.  Over time, as

Sterling Levered increased its synthetic exposure to Bayou Superfund, DBSP increased its long hedge

position in Bayou Superfund as a hedge against Deutsche Bank's increased exposure under the Total

Return Swap.  On February 11, 2005 Peter Stamos notified Deutsche Bank of Sterling Levered's decision

to terminate the Total Return Swap with respect to Bayou Superfund effective as of February 28, 2005.

At that time, DBSP's total investment in Bayou Superfund was $16,500,000.  No longer needing the

hedge against the Total Return Swap, DBSP sent a letter dated February 11, 2005 to Bayou Superfund

requesting redemption of its $16,500,000 investment.

It is perfectly evident from the foregoing undisputed facts that DBSP made its invest-

ments in Bayou hedge funds aggregating more than $32 million solely as a hedge against Deutsche

Bank's exposure to risk under the Alerion Swap and the Total Return Swap, and that DBSP requested

redemption of its Bayou Superfund investment because Deutsche Bank's risk exposure was terminated

under the Total Return Swap, while it did not request redemption of its Bayou hedge fund investment in

respect of the Alerion Swap because the Alerion Swap was not terminated.  These facts would establish

DBSP's good faith defense even if Deutsche Bank or DBSP had received knowledge of "red flags"

putting them on inquiry notice with respect to the Bayou hedge funds, but DBSP denies that it had any

knowledge of red flags respecting Bayou and plaintiffs do not claim that it had any such knowledge.

Plaintiffs' argument is, in substance, that Sterling Stamos controlled the decision whether

the Total Return Swap should continue to cover Bayou Superfund or should be terminated with respect to

the Bayou investment, and that DBSP and Deutsche Bank were fully protected from any loss in respect of

the Total Return Swap by reason of the Bayou long position hedge held by DBSP and Sterling Stamos'

secured obligation to indemnify Deutsche Bank in the event of loss.  The argument may be factually true,

but compels the opposite conclusion.  It demonstrates that DBSP's reason for requesting redemption was

not any knowledge of red flags putting it on inquiry notice, but simply the fact that Sterling Stamos

terminated the Total Return Swap with respect to Bayou, rendering unnecessary DBSP's long position

hedge in Bayou Superfund.  The fact (if it is a fact) that Sterling Stamos would be obligated to indemnify

DBSP if DBSP were required to refund its redemption payment in respect of the amount it invested in

Bayou Superfund is not relevant here, because DBSP has established its good faith defense under

Section 548(c) precluding liability in respect of the redemption of the amount it invested in Bayou

Superfund.

> Plaintiffs argue in reply that:

> Deutsche Bank, through its affiliate DBSP, bore no financial risk from DBSP's invest-
> ment in Bayou Superfund because the investment exactly mirrored and hedged Sterling
> Stamos's synthetic exposure under the Total Return Swap.

Plaintiffs' Omnibus Reply Memorandum at 78.  The argument continues:

> DBSP redeemed its Bayou Superfund investment automatically as a result of Sterling
> Stamos's decision to terminate its synthetic exposure to Bayou Superfund under the Total
> Return Swap.   As a matter of institutional policy, Deutsche Bank, through its affiliates
> such as DBSP, always redeemed hedge fund investments when its counterparty
> terminated a swap transaction.

*Id.* at 78-79.  The argument concludes:

> In sum, DBSP, as a matter of law, cannot sustain a "good faith" defense under
> section 548(c) of the Bankruptcy Code because its Bayou Superfund investment was
> intentionally structured such that DBSP's redemption decision was necessarily triggered
> by Sterling Stamos's decision to terminate the Total Return Swap, and DBSP "put on
> blinders" to Sterling Stamos's knowledge regarding the Bayou hedge funds.

*Id.* at 79.

> Contrary to the plaintiffs' legal conclusion, the facts relied upon by plaintiffs conclu-

sively establish DBSP's good faith defense as a matter of law.  These facts demonstrate that, even if

DBSP representatives had knowledge of the red flags which allegedly put Sterling Stamos on inquiry

notice (which plaintiffs do not assert), the DBSP decision to redeem its Bayou Superfund hedge position

was motivated not by any red flag or anxiety respecting Bayou but solely because the Bayou investment
was no longer required as a hedge against Deutsche Bank's risk under the Total Return Swap.

Plaintiffs' concluding assertion that "DBSP 'put on blinders' to Sterling Stamos's knowl-
edge regarding the Bayou hedge funds" (*id*.) appears to suggest that Sterling Stamos' alleged knowledge
and inquiry notice should be attributed to DBSP, a contention (if it is plaintiffs' contention) that is frivo-
lous as a matter of fact and law.    Sterling Stamos was not DBSP's or Deutsche Bank's broker or agent or
investment advisor whose knowledge or purpose could be attributed to either — it was Deutsche Bank's
counterparty in arm's length swap transactions.

The undisputed facts establish DBSP's good faith defense under Section 548(c) and re-
quire dismissal of plaintiffs' claim against DBSP in respect of the amount DBSP invested in Bayou
Superfund.

## 2.    High Sierra Investments (Adv. Proc. No. 07-08243)

High Sierra Investments ("High Sierra") was a hedge fund which invested in other hedge
funds (fund of funds).  High Sierra made an initial investment of $5 million in Bayou Superfund in
November 2003 and an additional investment of $5 million in Bayou Superfund in November 2004, for a
total of $10 million invested.  To quote plaintiffs:

> At some point in late 2004 or early 2005, High Sierra learned that its largest
> investor — ["Redacted Investor"] —  anticipated making a large redemption from High
> Sierra.  . . .   High Sierra thus needed to raise money to satisfy that redemption, which
> High Sierra expected to be effective at the end of March 2005.  . . .  Accordingly, High
> Sierra initially sought full redemptions — all to be effective at the end of March 2005 —
> from three of its investments: Bayou Superfund [and two other funds].  . . .  At the time,
> High Sierra's Bayou Superfund investment was reportedly worth approximately $11
> million.

Plaintiffs' Omnibus Memorandum of Law at 205.

On or about February 17, 2005 High Sierra sent a complete redemption notice to Bayou
Superfund.  After learning that its Redacted Investor's actual redemption request was lower than ex-
pected, on March 2, 2005 High Sierra rescinded its full redemption request from Bayou Superfund and
instead submitted a partial redemption request in the amount of $9.8 million, advising that High Sierra

was "very happy to be able to preserve [the Bayou] investment" and "look[ed] forward to a LONG stand-ing relationship with Bayou." *Id.* The redemption was "to be effective at the end of March 2005." *Id.* Section 10.4 of the Bayou Accredited Fund's Operating Agreement provided that payment of redemp-tions up to ninety percent of an investor's account "shall be made . . . within thirty (30) days of the effec-tive date of the withdrawal." Under this provision, High Sierra would have expected payment in full of its $9.8 million request for redemption by the end of April 2005. However, as acknowledged by plaintiffs (Omnibus Reply Memorandum at 81), the Operating Agreement reserved the right for Bayou Superfund to extend the payment deadline for an additional ninety days if "in the opinion of the Manager it would be in the best interests of the fund." *Id.* Thus, Bayou Superfund had the right to delay payment of the High Sierra redemption until the end of July 2005.

High Sierra did not receive its requested $9.8 million redemption by April 30, 2005. But it did receive redemption payments aggregating $8.3 million within the next three weeks, as follows: $3.8 million on May 2; $2 million on May 3; $1 million on May 4; and $1.5 million on May 23. During this period High Sierra made redemption payments to its Redacted Investor of $9.64 million on April 19, $13 million on April 28 and $3.7 million on May 3, 2005.

It is conceded that "Plaintiffs do not contend that High Sierra Investments ('High Sierra') was on 'inquiry notice' at the time it ***submitted*** its initial partial redemption request in March 2005." Plaintiffs' Omnibus Memorandum of Law at 202. Plaintiffs also concede that High Sierra's sole reason for requesting partial redemption of its Bayou Superfund investment and two other investments was to raise cash in order to honor the request for redemption by its own Redacted Investor. These undisputed facts establish High Sierra's good faith defense under Section 548(c) as a matter of fact and law.

Plaintiffs' claim against High Sierra is predicated entirely on the fact that High Sierra did not receive its redemption payment by Friday, April 29. But High Sierra did receive redemption pay-ments aggregating $6.8 million on May 2, 3 and 4, and a final payment of $1.5 million on May 23. Not surprisingly, the brief delay beyond the expected April 29 payment date caused a flurry of emails and phone calls emanating from a representative of High Sierra, squeezed for cash by its redemption pay-

ments to its own Redacted Investor, resulting in excuses and evasions from the Bayou employees. But it was not until May 19 that two representatives of Jones Commodities (an entity which served as the general partner of High Sierra) addressed separate emails to Bayou Superfund reflecting a concern about the financial condition of Bayou Superfund. High Sierra's concern about the financial condition of Bayou is also reflected in the fact that on that date, May 19, High Sierra reinstated its request for full redemption of its entire Bayou Superfund account, contradicting High Sierra's statement in early March that it "look[ed] forward to a LONG standing relationship with Bayou."

The brief delay between April 29 and the payments on May 2, 3 and 4 aggregating $7.3 million did not constitute either objectively or subjectively a "red flag" putting High Sierra on "inquiry notice" of the Bayou financial condition or fraud. Viewed objectively, the delay was *de minimis* and Bayou had the contractual right to defer redemption payment for up to ninety days after April 29. High Sierra's emails and phone calls through May 4 reflected its urgent need for cash resulting from its own redemption payments to its Redacted Investor, and there was no objective evidence of any reason for High Sierra employees to think that this brief delay was anything other than a temporary liquidity issue, such as High Sierra itself was facing.

The evidence proffered by plaintiffs with respect to May 19 — the emails sent by Jones Commodities representatives to Bayou and High Sierra's decision on that date to demand redemption of the balance of its Bayou Superfund account — do reflect High Sierra's subjective concern with respect to the financial condition of Bayou and, in fact, that concern did provoke inquiry and request for financial data by Jones Commodities on behalf of High Sierra. That evidence would certainly appear to undermine High Sierra's ability to sustain a good faith defense in respect of its May 19 request for redemption of the balance of its Bayou Superfund account. But that issue is not before the Court, since the May 19 request did not result in any redemption payment.

The only remaining issue is whether the May 19 evidence may be invoked by plaintiffs to undermine High Sierra's established good faith defense in respect of the last partial payment on May 23 of $1.5 million on its March 2 request for partial redemption. I conclude that the good faith defense

effective in March may not be revoked by the Court *nunc pro tunc* by post hoc events in May.   The

concern experienced by High Sierra with respect to Bayou's financial condition by May 19 resulting from

the delay in expected payments does not taint High Sierra's conceded good faith in requesting a $9.8

million partial redemption in early March.  As acknowledged by plaintiffs, "High Sierra's understanding

at the time was that its March 2, 2005 redemption request would be effective at the end of March 2005,

meaning that 'our $9.8 million would be removed from Superfund, by Superfund, effective at the end of

3/31/05, and not invested anymore.'"   Plaintiffs' Omnibus Memorandum of Law at 206.   Under the

Bayou Hedge Funds' Operating Agreement, the parties regarded a request for redemption as irrevocable

after the effective date of the redemption at the end of the month during which the request was made.

*See* Plaintiffs' Omnibus Memorandum at 83-85.

      A redeeming investor "takes" his redemption based upon the facts and circumstances

known to him on the date that he makes his request for redemption.  There is no legal or equitable basis

for the Court to revoke the investor's good faith defense based upon facts or events unknown to the

investor when he made his decision.

### 3.    Michael Mann (Adv. Proc. No. 06-08419)

      The Section 548(c) defense of Michael Mann is established on the facts alleged, and

those not alleged, in plaintiffs' own submissions (*i.e.*, the Omnibus Memorandum at 183-186, Omnibus

Reply Memorandum at 74-75 and Rule 56.1 Statement of Material Facts at ¶¶ 1102-1123).   Mann's

Section 548(c) defense is that he made his own decision to request redemption of his $500,000 Bayou

hedge fund investment shortly after he invested in January 2005 **and** that he had no knowledge of any red

flags putting him on inquiry notice of fraud or financial issues at Bayou.  While plaintiffs' factual account

differs in some respects from that of Mann, nowhere in their three submissions do plaintiffs assert that

Mann had knowledge or information of any red flags putting Mann on inquiry notice.

      Plaintiffs' allegations respecting Mann are summarized in Plaintiffs' Omnibus Memoran-

dum at 193-194 (citations to the record omitted; emphasis in original):

      Mann was an investor in Sterling Stamos in 2004 and 2005.  On January 1, 2005,

Mann made a direct investment of $500,000 in Bayou Superfund based on a referral from Peter Stamos. Mann asked Stamos if there were "investments in [Sterling Stamos's] funds that [Mann] could make directly." In response, Peter Stamos provided Mann with a number of funds, including the Bayou Hedge Funds. Stamos assured Mann that, although he was "not authorized" to give Mann "advice to invest in any single manager or to divest from any manager," he would "*keep [Mann] informed as to with whom we had invested and when we chose to redeem.*" Other than reviewing a set of marketing materials received from Bayou Superfund, Mann did not conduct any other due diligence or research prior to investing in Bayou Superfund.

Peter Stamos kept his promise to inform Mann as to when Sterling Stamos "chose to redeem" from the Bayou Hedge Funds. On February 14, 2005 — while Mann was on vacation in Barbados — Peter Stamos "called [Mann] to tell him that we had decided to redeem [from Bayou]." Mann immediately responded to Peter Stamos that "if you all are . . . redeeming, then I will redeem as well." Mann never performed any further investigation into the Bayou Hedge Funds.

Promptly thereafter, representatives of Sterling Stamos assisted Mann in his redemption, including preparing and faxing to Mann at his hotel in Barbados a redemption notice for Mann to sign, which Mann received, signed and faxed to Bayou the same day. When he returned from vacation the following week, Mann wrote an email to Bayou to confirm his redemption notice stating: "[A]s you know I was brought to your fund by [P]eter [S]tamos. [S]ince they are pulling out their funds for particular reasons, I am doing the same." Plaintiffs conclude their recitation of facts concerning Mann with the following paragraph:

Based on the foregoing undisputed facts, Mann cannot sustain his affirmative defense of statutory "good faith" under section 548(c) because he was on "inquiry notice" and failed to conduct a "diligent investigation" at the time he took the Redemption Payment.

*Id.* at 196.

The problem with this conclusory assertion is that nowhere do plaintiffs explain by allegation of any facts what it was that Mann was on "inquiry notice" of, and nowhere do plaintiffs allege that Mann had knowledge of any "red flag" putting him on notice of any fraud or financial distress at Bayou, such as the *Westervelt* lawsuit, which was the red flag which plaintiffs point to with respect to Sterling Stamos. *See* point III D 3, below. The only reference in plaintiffs' submissions respecting what Sterling Stamos told Mann on February 14 appears in the Omnibus Reply Memorandum at 74:

According to Mann, he was told that Sterling Stamos "was not happy with the infrastructure at Bayou."

Lacking explanation by plaintiffs, only two postulates suggest themselves as a predicate for plaintiffs' conclusory allegation that Mann was "on inquiry notice."   One is that Sterling Stamos' decision to redeem its investments in the Bayou hedge funds was by itself a "red flag" warning signal of fraud or financial problems at Bayou.  I reject this postulate because there could have been any number of reasons for the Sterling Stamos Funds to redeem their Bayou investments, including liquidity issues such as prompted High Sierra to divest itself of its Bayou investment.  The other postulate — that Sterling Stamos' knowledge of red flags, including the *Westervelt* lawsuit, should be imputed to Mann even though there is no evidence that Mann had information concerning *Westervelt* or any other red flags — must also be rejected.  Sterling Stamos was not acting as broker, financial advisor or agent in any respect on behalf of Mann.  The fact that Peter Stamos, in response to an inquiry from Mann, advised Mann of several hedge funds in which the Sterling Stamos hedge funds were invested in which Mann could invest on his own, and that Stamos said he would inform Mann if and when Sterling Stamos decided to divest any of those investments and did so, did not give rise to any agency or other relationship such that Sterling Stamos' knowledge could be imputed to Mann.

When Mann proffered his affirmative defense of good faith under Section 548(c), the burden shifted to the plaintiffs to rebut that defense by evidence that Mann had knowledge of red flags putting him on inquiry notice of problems at Bayou.  Plaintiffs have not met that burden, and Mann is entitled to summary judgment dismissing the claim against him in respect of his investment in Bayou.

D.      **Issues of fact requiring a trial**

Plaintiffs have acknowledged in respect of nine adversary proceedings, and I have concluded in respect of four additional adversary proceedings, that there are issues of fact requiring a trial to resolve the defendants' good faith defenses under Section 548(c).   This does not affect plaintiffs' right to summary judgment against these defendants to recover fictitious profits in accordance with this Court's rulings under point II D 1 and 2, above.

1.      **William Strang (Adv. Proc. No. 06-08387)**
        **Randall M. and Sheryl B. Rothstein (Adv. Proc. No. 06-08389)**
        **Alan Osofsky (Adv. Proc. No. 06-08398)**

- 57 -

**DW Resources DBP and Marc Daniels (Adv. Proc. No. 06-08415)**
**Marc Fleisher IRA and Marc Fleisher (Adv. Proc. No. 06-08423)**
**Kevin Bass (Adv. Proc. No. 06-08431)**
**Michael Davidson (Adv. Proc. No. 06-08435)**
**Neil D. Cohen (Adv. Proc. No. 07-08245)**
**Edward and Virginia Sorkin (Adv. Proc. No. 07-08246)**

Plaintiffs' claims against these nine defendants (the "Kra defendants") arise from their relationship with Howard Kra ("Kra"), a former Bayou sales employee who marketed Bayou hedge funds to his friends and former brokerage clients. It is alleged that Kra's largest source of introduced accounts, Lydian Wealth Management, became aware of an FBI investigation of Bayou, informed Kra, and advised its own clients to redeem their Bayou investments. Shortly thereafter Kra resigned from Bayou, and he and all his clients redeemed their Bayou investments. Eighteen Lydian-related Bayou investors who redeemed have settled adversary proceedings commenced by plaintiffs. Kra himself and five of his clients who redeemed have settled with plaintiffs.

The nine Kra defendants listed above deny that they were "tipped" by Kra and have moved for summary judgment based, *inter alia*, on their good faith defenses under Section 548(c).

Plaintiffs acknowledge that there are material issues of fact requiring a trial on all of the Kra defendants' affirmative defenses under Section 548(c). Because I agree that the facts relevant to the 548(c) defenses are in dispute, the cross-motions for summary judgment of the Kra defendants are denied.

**2.      Mary Jane Pidgeon Sledge (Adv. Proc. No. 06-08339)**

Mary Jane Pidgeon Sledge ("Sledge") and her husband were clients of the investment advisory firm Consulting Services Group ("CSG"). *See* point III E 3, below. In December 2003 Mr. Sledge died. Because Sledge was then in her mid-seventies and in uncertain health, her daughter, Phillipa, assumed control of Sledge's financial affairs.

On June 28, 2004 Sledge received a fax from CSG (apparently unsolicited) with a redemption form for Bayou. Phillipa arranged for her mother to sign the redemption form covering the whole of the Sledges' investments in Bayou hedge funds and faxed the form back to CSG.

On the basis of the facts summarized in point III E 3 below, a June 25 letter to Sledge from CSG, a conversation on June 28 between a representative of CSG and Sledge and a conversation between an accountant and Sledge, plaintiffs assert that Sledge cannot sustain her burden of proof on a good faith defense under Section 548(c).  Sledge and Phillipa deny receipt of the June 25 letter from CSG, deny any conversation with a representative of CSG in June 2004 and do not recall the conversation with the accountant as alleged by plaintiffs.  Phillipa has testified that she decided in January 2004 to redeem her family's investment in Bayou and other hedge funds at what she believed to be the next semi-annual redemption date, and Phillipa and Sledge deny having any knowledge of any of the red flags which caused CSG to recommend redemption of their Bayou investments to their clients.

The dispute of facts regarding Sledge's redemption requires a trial.

**3.      Sterling Stamos Funds (Adv. Proc. No. 06-08493)**

Each of the four Sterling Stamos Funds is a fund of funds.  Between April 2003 and October 29, 2004 the four Sterling Stamos Funds had invested an aggregate of $15.7 million in various of the Bayou hedge funds.   In November 2004 a representative of TAG Associates, an investment advisor and a hedge fund manager, sent Sterling Stamos a copy of a complaint filed by Paul Westervelt, a former "principal" or "partner" of the Bayou Management entity, against Samuel Israel alleging that Israel and Bayou engaged in SEC violations and other financial improprieties, that Westervelt as a Bayou "partner" was precluded from access to Bayou financial records, and that he was fired when he sought explanations from Israel and Marino.  *See* point III E 2, below.  The TAG Associates representative advised Sterling Stamos that TAG Associates intended to redeem its Bayou investment because of failure to get a satis-factory explanation of the *Westervelt* complaint from Israel.  After receiving the *Westervelt* complaint from TAG Associates, Sterling Stamos decided to increase its due diligence concerning Bayou and ob-tained two background investigative reports.   A Sterling Stamos representative also inquired of Israel who advised that Westervelt was just a disgruntled employee and the case had been settled.

Apparently unperturbed by the *Westervelt* complaint and the two investigative reports, the Sterling Stamos Funds invested an additional $14 million in Bayou hedge funds between early December 2004 and early February 2005, bringing its total Bayou investment to $29.7 million.

On February 7, 2005 a new General Counsel and a new Associate General Counsel joined Sterling Stamos.  New counsel reviewed the due diligence file on Bayou, including the *Westervelt* complaint, and concluded that a number of questions suggested by the due diligence materials should be put to Israel at a meeting with Israel and other Bayou representatives which had previously been scheduled for February 9, 2005.

At the February 9 meeting Peter Stamos expressed "concerns . . . about the strength of [the Bayou] organization" and made three suggestions regarding "organizational issues."  Israel responded favorably to the Stamos recommendations, told Sterling Stamos that he intended to implement all three suggestions and reported enthusiastically that he was considering trading in asset classes other than equities and that he was considering creating a "new bigger fund."  Near the end of the February 9 meeting Sterling Stamos' new General Counsel asked Israel questions raised by the *Westervelt* complaint and other due diligence obtained by Sterling Stamos.  Israel became irritated and was "dismissive of" the General Counsel's questions, and he did not provide answers.

After the February 9 meeting with the Bayou representatives, Peter Stamos met privately with his new General Counsel and other Sterling Stamos officials who were present at the February 9 meeting.  The General Counsel advised that his "gut feeling [was] that [Sterling Stamos] should not be investing with Bayou and Sam Israel," and he advised another Sterling Stamos partner that "he would redeem" Sterling Stamos' Bayou investments.

After considering the views of Sterling Stamos' General Counsel and other representatives present at the February 9 meeting, Peter Stamos made the decision to redeem the entire investment of all four Sterling Stamos Funds.  Notice of the redemption was given on February 11, 2005.

In addition to the fact that Sterling Stamos was on objective notice of the *Westervelt* com-
plaint and other facts learned in the course of due diligence, as well as Israel's "dismissive" refusal to
respond to questions by General Counsel at the end of the February 9 meeting, plaintiffs rely on two addi-
tional events which occurred after Sterling Stamos' February 11 notice of redemption.  One was Bayou's
"unethical" proposal, tendered one week before the initial deadline to make the redemption payments, that
if Sterling Stamos would revoke their redemption notice of February 11 Sterling Stamos would be entitled
to participate in Bayou's profitability for March.  The Bayou proposal was recognized as "unethical"
because after Sterling Stamos' February 11 redemption, effective at the end of February, the Sterling
Funds would no longer be eligible to participate in the putative March gains and therefore would be
taking participation in the March gains away from the remaining investors.  The other post-redemption
factor claimed to put Sterling Stamos on inquiry notice was that its redemption payments were spread
over nine wire transfers on March 31 and April 1, one and two days past the thirty-day contractual
deadline.

Sterling Stamos denies that the reason it redeemed its Bayou investments was the
*Westervelt* complaint and other due diligence or Israel's dismissive response to questions at the
February 9 meeting raised by Sterling Stamos' General Counsel, asserting:

> The reasons the Sterling Funds redeemed from Bayou are well documented.
> Seven different current or former Sterling Funds employees testified as to those reasons,
> and all confirmed that the Sterling Funds redeemed because of (i) Bayou's intent to trade
> not just U.S. listed equities, but also commodity futures, a different and more volatile
> asset class ("style drift"); (ii) Bayou's intent to quadruple its assets under management
> ("asset growth"); and (iii) the strain that such style drift and asset growth would place on
> Bayou's infrastructure.

Memorandum of Law of the Sterling Funds at 49.

In their Omnibus Reply Memorandum, plaintiffs object that the Sterling Stamos submis-
sion was "mostly concern[ed with] the *subjective* reason that the Sterling Stamos Funds submitted their
complete redemption from the Bayou Hedge Funds in February 2005," arguing that "Sterling Stamos's
subjective intent is irrelevant."   Omnibus Reply Memorandum at 66.  Noting Sterling Stamos' acknowl-
edgment that "the facts that are presented [by plaintiffs] are undisputed," plaintiffs argue that "[t]hose

undisputed facts are sufficient on their own to preclude Sterling Stamos's affirmative defense, as they establish that Sterling Stamos was on objective inquiry notice prior to taking the redemption payments."

On its face, plaintiffs' argument (excluding the contentions based on Bayou's post-redemption "unethical" offer and the *de minimis* delay in redemption payments, both of which I reject as a matter of law for reasons explained above) is very persuasive. Going into the February 9 meeting, Sterling Stamos was certainly on inquiry notice of serious issues involving Bayou raised by the *Westervelt* complaint and the two investigative reports obtained following receipt of the *Westervelt* complaint. Viewed objectively, Israel's concededly "dismissive" responses, indeed refusal to respond, to General Counsel's questions at the end of the February 9 meeting could only have increased, rather than allayed, the concerns raised by the red flags which were known to Sterling Stamos.

But plaintiffs ignore a salient fact which distinguishes this unusual case. Sterling Stamos representatives were in possession of the *Westervelt* complaint and the two investigative reports in November 2004 and conducted such due diligence inquiries as occurred to them, and whatever concerns they may or should have had were sufficiently set to rest that Sterling Stamos increased its investments in Bayou hedge funds by $14 million during December, January and early February 2005. That fact is conclusively established by the objective evidence of the Sterling Stamos' purchases in December-February. Had Sterling Stamos not increased its investment in the Bayou hedge funds between December and February, I would agree that under the objective standard test Sterling Stamos' protestations of a subjective, unverifiable good faith purpose for redemption would not suffice, since Israel's dismissive refusal to answer questions at the February 9 meeting objectively exacerbated the concerns that prompted the questions. However, as previously noted under point III A, above, an evaluation of good faith may include objective evidence of the transferee's subjective intent or good faith. Here, Sterling Stamos' investment of an additional $14 million despite knowledge of all of the red flags which concerned its General Counsel at the February 9 meeting certainly constitutes objective evidence that the Westervelt red flags did not

motivate Sterling Stamos to seek redemption, at least not until after February 9 when Israel evaded the hard questions in the presence of Peter Stamos and his associates.

By the same token, however, the Sterling Stamos Funds' investments in Bayou during December-February do not mandate summary judgment on their cross-motions for summary judgment. That is because Sterling Stamos' newly-hired General Counsel and Associate General Counsel re-examined the Bayou due diligence materials, questioned Israel at the February 9 meeting and apparently recommended redemption based on Israel's "dismissive" refusal to respond.

A trier of fact may, or may not, believe Peter Stamos' "good faith" explanation that the February 11 redemption notice was based solely on concerns over organizational or structural issues or Israel's expressed intent to expand the scope of Bayou's investment strategy, and not on the Westervelt red flags and Israel's refusal to answer questions, which obviously motivated his new General Counsel. But the issue of fact should be resolved by a trier of fact on the basis of a full trial record.

## 4.      Highgate Partners LP (Adv. Proc. No. 06-08412)

Highgate Partners LP ("Highgate") is a fund of funds which is "a single-person opera-tion" that "is owned and operated exclusively by Ms. [Ellen] Horing," and Horing "is also Highgate's sole employee" (quoting from Highgate's Memorandum of Law at 2, 3).

Horing became a partner in Sterling Stamos in late 2002/early 2003.  Because of family demands, Horing arranged with Sterling to change her status to that of a withdrawing partner.  As such, Horing had the right to share in Sterling Stamos' cash flow at a reduced rate over a number of years, but she had no continuing direct operational responsibility at Sterling Stamos and was no longer expected to go into the Sterling Stamos offices on a regular basis.  Horing conducted Sterling Stamos' due diligence concerning the Bayou hedge funds in 2003 and 2004, including reviewing the Bayou hedge funds' oper-ating agreements, subscription documentation and marketing materials, conducting reference checks and attending meetings at Bayou's offices.  Sterling Stamos' internal records identify Horing as the "source"

of Sterling Stamos' Bayou investment.  Both Sterling Stamos and Highgate made their initial investments

in the Bayou hedge funds within the same week of each other in late March or early April 2003.

Highgate invested $850,000 in Bayou Superfund in April 2003.   Highgate requested

redemption of its entire investment in Bayou Superfund on February 11, 2005, the same date as the

Sterling Stamos request for redemption, and received redemption payments in the amount of $981,000.

Horing attended the February 9, 2005 meeting between Sterling Stamos representatives

and Israel and other representatives of Bayou.  Horing made the decision to redeem Highgate's invest-

ment in Bayou immediately following the February 9 meeting, and she informed the Sterling Stamos

General Counsel of her decision to redeem "as she was walking out" of the February 9 meeting.

Horing denies that her decision to redeem Highgate's Bayou Superfund investment was

motivated by any concern over the *Westervelt* lawsuit or Israel's "dismissive" refusal to respond to the

questions concerning Westervelt put to him by Sterling Stamos' new General Counsel.  Horing's rationale

for her decision to redeem is expressed as follows in Highgate's Memorandum of Law at 5:

> After hearing these significant developments [Israel's announcement that he
> intended to grow "the Bayou fund" from approximately $500 million of net asset value to
> a range of $1 to $2 billion and planned to move into commodity short-term trading], Ms.
> Horing decided to withdraw her investment.  Both strategic changes announced by Israel
> were, to Ms. Horing, problematic.  Vastly increasing the size of the fund would have
> made it more unwieldy and would have over stressed the existing Bayou infrastructure.
> Moreover, short-term commodity trading involves a different skill-set than the short-term
> equity trading in which Mr. Israel had established his reputation.  Ms. Horing had seen
> other examples of this type of "style drift" and the results were often disappointing.
> Accordingly, Ms. Horing thought the prudent course was to exit Bayou, at least until
> Israel could demonstrate his competence in this different trading discipline, with a
> significantly larger fund.[15]

Unlike the Sterling Stamos funds, Horing did not increase Highgate's investment in the

Bayou hedge funds after learning of the *Westervelt* lawsuit in October 2004.  But Horing's continuing

---

[15]   Highgate's Memorandum repeatedly refers to the "Bayou fund," as if to suggest that there was
only one Bayou fund, although there were in fact at least three domestic Bayou hedge funds (the
three plaintiffs in these adversary proceedings) and several offshore Bayou funds.  Moreover, it is
not clear on the evidence now before this Court whether Israel's comments at the February 9 meet-
ing were to the effect that his intention was to increase the size of one or more of the existing
Bayou hedge funds, or start a new hedge fund, or whether his intention was to move into commod-
ity short-term trading in one of the existing Bayou hedge funds or in a new and different Bayou
fund.

close relationship with Sterling Stamos and the fact that she did not seek to redeem Highgate's investment in Bayou Superfund until after the February 9 meeting gives rise to the same issue of fact requiring a trial as in the adversary proceeding against the Sterling Stamos defendants, namely, whether these defendants' decision to redeem after the February 9, 2005 meeting was in fact motivated by Israel's optimistic and expansive plans for the Bayou funds or by Israel's dismissive refusal to answer questions concerning the Westervelt charges.  That issue should be decided by a trier of fact on a full trial record.

### E.    Summary judgment granted for plaintiffs

Before turning to the specific facts pertaining to the individual defendants against whom summary judgment is to be granted rejecting their 548(c) defenses, it will be useful to examine the "inquiry notice" due diligence performed by two investment advisors during 2004, and the "red flags" which provoked them, which have a significant bearing on the parties' contentions on the pending motions and cross-motions for summary judgment.  One is the Altegris due diligence and the other is the *Westervelt* complaint and resulting due diligence performed by CSG.

### 1.    Background: the Altegris due diligence

Altegris Investments ("Altegris") is a registered broker-dealer which offers a platform of hedge funds and commodity pool products to qualified investors.   In early 2002 Altegris entered into a selling agreement with Bayou Management and began recommending the then-existing Bayou Fund to its clients.  In late 2003 or early 2004, after the original Bayou Fund had been closed, Altegris had discussions with Bayou Management about entering into a selling agreement for the new Bayou hedge funds.  It appears that at a meeting on June 17, 2004 Altegris learned that Bayou's off-shore administrator was not independently preparing net asset values (NAVs), but that Marino was providing "all the financial information required for the calculation of the NAVs."  Altegris was told that, other than the annual audits by Richmond-Fairfield, "no other independent outside parties are looking at monthly NAVs."

Upon learning that the Bayou hedge funds were calculating their own NAVs, Altegris asked Marino to allow Altegris to conduct its own verification of NAVs, including reviewing the Bayou hedge funds' monthly prime broker statements.  Marino refused this request and subsequent requests "to

give Altegris month-end asset transparency" by allowing Altegris to conduct "a simple check on assets and monthly NAVs." Accordingly, Altegris decided in July 2004 to conduct further due diligence including a review of the Bayou hedge funds' audited financial statements and contact with the Bayou hedge funds' auditor, Richmond-Fairfield. As part of that due diligence, Altegris searched the New York Department of State records to determine whether Richmond-Fairfield was a registered accounting firm. That search disclosed that Marino was the "Registered Agent" for Richmond-Fairfield. After a telephone conversation with Marino on July 6, 2004, Altegris addressed the following written communication to Marino:

> Dan — Further to our telephone conversation today, please provide a written explanation of your relationship with Richmond Fairfield. Specifically, this should include the history of the firms; the relevant dates of your involvement; the details regarding your exit from Richmond Fairfield and start with Bayou; and the retention of Richmond Fairfield by Bayou to prepare annual audits. You might also address why the New York Society of Accountants still records you as the member/manager for Richmond Fairfield, and also has no record of either Dan or Matt Richmond. Please reply as soon as possible on these issues.

Two days later, on July 8, 2004, Altegris contacted its clients who were invested in Bayou hedge funds recommending that they redeem their Bayou investments, explaining that Altegris was "becoming increasingly uncomfortable" because of a "continued lack of transparency," and "questions regarding [Bayou's] recent audit that have remained unanswered."[16]

The Altegris due diligence is relevant to these contested adversary proceedings because it graphically undermines the contentions of a number of defendants, referred to above, that no reasonable due diligence could have discovered the Bayou fraud. To the contrary, a simple inquiry by Altegris concerning the method by which the Bayou hedge funds' NAVs were calculated and controlled, and Marino's responses, promptly revealed to Altegris (i) that Bayou Management's representation in the published financials that Richmond-Fairfield was an independent accounting firm was false, (ii) that Marino was a principal, apparently the only principal, of Richmond-Fairfield, (iii) that there was no inde-

---

[16]   All of the Altegris clients promptly requested redemption of their Bayou investments, and all have entered into settlement agreements with the plaintiffs in these adversary proceedings.

pendent audit or review of the Bayou hedge funds' published NAVs and other financial reporting and (iv) that Bayou would not permit Altegris to conduct its own audit or independent review of the Bayou hedge funds or to examine the prime brokerage and bank statements which should have been the source of the Bayou NAVs, but in fact were not because Israel and Marino simply made up fictitious numbers. These facts did not reveal the full scope or detail of the Bayou fraud, but they did reveal the fact that there was a fraud — the fact that Richmond-Fairfield as an independent auditing firm was a fiction and a gross misrepresentation; the fact that Bayou prepared its own NAVs without independent review; the fact that Bayou would not permit an entity which was a Bayou sales representative with many clients invested in Bayou funds access to the primary source documents which would verify or contradict Bayou's published financial statements.

The Altegris facts also illuminate the concept of "good faith" as used in Section 548(c) of the Bankruptcy Code. There is not a single element of "bad faith" or misconduct of any sort on the part of Altegris or its clients. Quite the contrary, the Altegris due diligence and recommendation to its clients to divest their Bayou investments, and the decisions of all Altegris clients to redeem their Bayou investments, were in every respect proper and entirely reasonable in the circumstances. The good faith requirement was not designed by Congress nor has it been interpreted by the courts to deter or sanction misconduct. Like Section 547, which requires innocent creditors to refund payments of money owed to them within ninety days of a bankruptcy filing, Section 548 seeks to promote a limited degree of equality of treatment among creditors (in this case, defrauded investors in the Bayou hedge funds) by requiring redeeming investors to return transfers found to be fraudulent on the part of Bayou management under subsection (a) unless the redeemers can establish that they received such transfers "in good faith" under subsection (c), *i.e.*, without being on inquiry notice of some infirmity on the part of the transferor.

### 2.   **Background:  the *Westervelt* complaint**

For Altegris the red flag provoking the inquiries which led swiftly to the revelation of the Bayou fraud was the discovery that Marino was preparing the NAVs for one of the Bayou offshore funds. For Consulting Services Group ("CSG") and its closely-related hedge fund manager, Centennial, the ini-

tial red flag was the *Westervelt* complaint (P-CSG Ex. 15), which was filed on March 26, 2003 in the

United States District Court for the Eastern District of Louisiana.

The plaintiffs in that case were Paul T. Westervelt, Jr. ("Westervelt") and his son Paul T.

Westervelt, III.  The defendants were Bayou Management, L.L.C., Bayou Funds, Bayou Securities,

L.L.C., Dan Marino and Sam Israel, III.  The complaint alleged that Westervelt "had for 33 years been

engaged in the business of investment management, investment counseling and fund management in and

around the City of New Orleans and had established an excellent reputation, both personally and profes-

sionally, as being very successful in those fields, with particular expertise in hedge fund management."

Westervelt had provided a wide variety of investment services "for which he was justifiably well-com-

pensated" by the Johnson Rice and Company of New Orleans.   In the summer of 2002 Israel approached

Westervelt to leave his employer and join forces with Israel, Marino and Bayou.  Over several months of

negotiations, Israel and Marino "actively recruited Westervelt to become a principal and shareholder in

Bayou."  The complaint alleges that Israel, Marino and Westervelt reached an agreement, documented by

letters of intent dated September 30, 2002, under which "Bayou agreed to pay Westervelt $800,000.00

per year through October 31, 2007, and convey to him an immediate 25% ownership interest in Bayou

Management, L.L.C., to be formally documented no later than December 31, 2002, with the prospect of

increasing that ownership interest over time to 33%."   Under the agreement Bayou also agreed to employ

Westervelt, III as an assistant to Westervelt at an annual salary of $90,000.00 for five years, through

October 31, 2007, plus annual bonus to be determined.  Westervelt and his son commenced their employ-

ment and were paid the salaries contemplated in the September 30, 2002 agreement.

With this background, the complaint went on to allege four serious charges against Israel,

Marino and Bayou.

The first was that Israel and Marino repeatedly denied Westervelt access to Bayou finan-

cial information and business records.  As alleged in the complaint:

> In particular, although Israel and Marino described Westervelt as a partner (see
> Exhibit "A"), and recognized him as such, they failed to provide him access to, and
> actively prevented him from obtaining, critical business documents and financial in-

formation relating to Bayou, to which Westervelt was entitled and which he needed to
conduct his business and protect his business interests and reputation.

Complaint at 5.

\* \* \*

Although he needed, requested and was entitled to financial documentation re-
lating to Bayou, including income statements, balance sheets, monthly account state-
ments and other financial documents evidencing the ongoing business activities of
Bayou, Marino and Israel, individually and as principals of Bayou, repeatedly and delib-
erately obstructed Westervelt's access to those documents and information, thereby deny-
ing Westervelt critical information concerning the business interest for which Israel,
Marino and Bayou had recruited him.  In short, they had recruited him into a business, for
which he gave up a very successful existing business arrangement, and thereafter actively
prevented him from knowing what the business was doing from a financial standpoint.

*Id.* at 7.

Second, Westervelt "discovered what he perceived to be possible violations of S.E.C.

regulations governing the operation of hedge funds, as well as other perceived possible violations of

S.E.C. and N.A.S.D. rules and regulations." *Id.* at 6.  In addition, Westervelt became concerned that

"Israel and Marino might intend to use the North Carolina brokerage office for a purpose that he believed

was improper and unethical and would be detrimental to Bayou's investors."  *Id.*  Concerned with these

matters, "Westervelt requested, but was unable to obtain, information and records necessary to evaluate

these matters," leading Westervelt to fear "that he might have duties to investors, co-workers and regu-

latory bodies, and that he might be exposed to criminal charges, professional censure, and civil liability,

as well as damage to his business relationships and his professional and personal reputation." *Id.*

Third, Westervelt was able to obtain some documentation "from which he learned that

Bayou's capital trading account at Spear, Leeds & Kellogg ('Spear Leeds'), had been depleted by more

than $7 million in December 2002," including "a withdrawal of $4.2 million on December 26, 2002."  *Id.*

at 8.  The allegation continues:

Although Westervelt repeatedly asked Israel and Marino to explain the depletion of
Bayou's capital account in December 2002, he never received any explanation, nor was
he provided any subsequent account statements demonstrating further activity in that
account.

*Id.*

Fourth, when Westervelt sought to resolve what he perceived to be very significant problems with Bayou by addressing his concerns in a letter to Israel in March 2003, Westervelt and his son were both promptly fired by Bayou. The *Westervelt* complaint alleges:

> In an effort to resolve what Westervelt perceived to be very significant problems with Bayou, . . . Westervelt expressed his concerns in a letter to Israel dated March 9, 2003. (See Exhibit "C"). In response, and in retaliation for requesting information and refusing to engage in any illegal, improper, unethical, or detrimental conduct, Bayou, Israel and Marino terminated Westervelt's contract on March 17, 2003. Bayou also terminated Westervelt, III's employment.

*Id.* at 9.

A few defendants have argued that the *Westervelt* complaint should not be deemed a red flag putting them on inquiry notice because other Bayou investors knew about the complaint, were not troubled by it and did not redeem,[17] including members of the Creditors' Committee in these bankruptcy cases. The argument highlights the embarrassing fact that the conduct of those victimized by a fraud is invariably judged in hindsight. Today, those investors or investment advisors like Altegris and CSG, who were alarmed by the *Westervelt* complaint and who recommended redemption after their attempts to investigate were met with evasion and rebuff, look the part of heroes, whereas those who knew of but ignored the warnings do not. But as the case law makes clear, the courts eschew a subjective approach based on the number or identity of those fraud victims who did or did not respond to warning signals, and instead look to an objective standard.

Viewed objectively, the *Westervelt* complaint was a clarion call for a Bayou investor to ask questions and get answers beyond Israel's dismissive retort that Westervelt was just a disgruntled employee. Those who attempted to do this were met with obfuscation and stonewalling, alerting them that there might be some problem with Bayou or its top management, and they understandably redeemed. The fact that other investors knew of the *Westervelt* complaint and did not investigate or redeem may reflect on their diligence or perspicacity, but it is of no moment under the objective standard and does not

---

[17] An example is the management of the Sterling Stamos Funds who (until the arrival a few months later of a new General Counsel who reviewed the *Westervelt* complaint and demanded that questions be asked) not only did not redeem their large investments in the Bayou hedge funds but nearly doubled their Bayou investments after receiving the *Westervelt* complaint. *See* point III D 3, above.

bolster the Section 548(c) defense of those investors who did redeem.

### 3.    Investigation by CSG and Centennial

As explained at length in plaintiffs' Omnibus Memorandum (pp. 61-64), "[t]he true gravity of CSG's decision to advise its clients to redeem their Bayou investments in June 2004 can be fully understood only in the context of the close, longstanding relationship that CSG and particularly its CEO, Lee Giovannetti, had developed with the Bayou Hedge Funds as early as 1999." *Id.* at 61.

During the relevant time period CSG was a registered investment advisor in Memphis, Tennessee, which conducted much of its advisory services through a wholly-owned subsidiary, Alternative Investment Strategies ("AIS"). CSG's Chief Executive Officer was Lee Giovannetti. CSG was one of several owners in a hedge fund manager called Centennial, which sponsored and managed several fund-of-funds hedge funds.   In addition to CSG's ownership interest in Centennial, there were close relationships between the two organizations.   One of CSG's subsidiaries had a "selling agreement" with Centennial under which it received a management fee from Centennial for referring clients or capital.   In 2003 Joe Wade left his position as President of CSG's subsidiary AIS and became President of Centennial, although he continued as a paid consultant to AIS at least through July 2004.  Both Wade and Centennial's Chief Operating Officer, Brian McNeil, were involved in CSG's investigation of Bayou and in the decision of both CSG and Centennial to advise their respective clients to redeem their investments in Bayou.

One of Centennial's hedge funds began investing in the original Bayou Fund in September 2000, and one of CSG's clients first invested in the Bayou Fund in January 2001.  During the next three years at least ten other CSG clients invested in the Bayou hedge funds based on CSG's recommendation.  CSG through its wholly-owned broker-dealer entered into an arrangement with Bayou Securities to obtain trade commissions based on a percentage of referred client assets under management. Giovannetti served as a reference for the Bayou hedge funds, speaking to potential investors who called him for a reference.  Giovannetti also helped the son of one of CSG's owners get a job as a trader at Bayou Securities.  As stated by plaintiffs, "well into 2004, and within a month prior to advising redemp-

tions, CSG continued to recommend the Bayou Hedge Funds as an investment to its clients."  Omnibus

Memorandum at 63.

In early 2004 CSG obtained background investigative reports concerning Israel and

Bayou hedge funds from a firm called "BackTrack Reports," one of which contained a description of the

*Westervelt* complaint.  Concerned about the Westervelt allegations and other information in the Back-

Track Reports, CSG requested and obtained a copy of the complaint and, following a May 19, 2004

meeting of its Investment Policy Committee, CSG asked BackTrack to "follow-up" on the *Westervelt*

complaint.  As summarized in plaintiffs' Omnibus Memorandum, "[a]t CSG's request, BackTrack inter-

viewed Westervelt, who referred BackTrack to the complaint, and added that BackTrack was 'doing the

right thing' by following up on the matter and that he 'would not do business' with Israel."  *Id.* at 68.

Giovannetti also made inquiries concerning the *Westervelt* complaint, and he inquired of Israel who told

Giovannetti that Westervelt was a "disgruntled employee," which "initially satisfied" Giovannetti

"because [he] trusted Israel."  *Id.* at 69.

During this same period of time CSG became concerned about the independence and in-

tegrity of the Bayou hedge funds' calculation of NAVs.  In February 2004 CSG had assumed authority to

make investment decisions for one of its clients, ERF Hedge Fund ("ERF"), and at CSG's direction ERF

invested in one of the Bayou offshore funds on March 1, 2004.  By the end of May 2004 CSG had not

received Bayou hedge fund NAVs which it had requested for ERF.  On June 1, 2004 CSG emailed the

offshore administrator of the Bayou offshore fund in which ERF had invested to inquire why the admini-

strator had not issued NAVs for March and April 2004.  The offshore administrator responded that he had

not received any NAVs and, responding to further questions, advised that the NAVs were prepared by

Bayou management and that the offshore administrator did not see any prime broker or custodial state-

ments and did not price any securities or determine any NAVs, which was contrary to the understanding

which CSG had.  CSG then called Marino to inquire about the delay in issuing the NAVs, and Marino

responded that he would call the offshore administrator to inquire why the administrator had not yet

issued the NAVs, which contradicted the information CSG had received from the offshore administrator.

In the end, CSG received the final figures for the offshore fund from Bayou itself, not the offshore ad-

ministrator.  From these inconsistencies CSG concluded that it "needed to do further investigation" con-

cerning the calculation of NAVs by Bayou management because it was concerned that it did not have

"transparency in the ability to document on behalf of our client . . . how the net asset value was being

calculated."

       Accordingly, on June 3, 2004 Giovannetti called Marino to request a due diligence meet-

ing and information on the calculation of NAVs and the *Westervelt* complaint.  Marino agreed and asked

Giovannetti to send him an email setting forth CSG's specific requests for information.  Giovannetti re-

sponded by email to Marino dated June 3 stating on behalf of CSG and Centennial:

> To summarize, the following are the specific issues that we would like to review:
>
> 1.     Confirmation of the NAV calculation for the various Bayou funds in which CSG/AIS/Centennial clients are invested.
>     - We will need to be able to review supporting statements from your prime broker.
>     - Review of internal reconciliation procedures.
>     - Permission to discuss with Bayou's independent auditor the procedures used in preparing the annual audit reports.
>     - Review of independent auditors review of Bayou's Internal Controls and Procedures.
>
> 2.     The Paul Westervelt issue.  We have seen his version, but would like to see Bayou's side.
>     - We would like to hear the history of his involvement with Bayou, including roles and responsibilities.
>     - Review any documentation related to this matter.
>     - Review all brokerage affiliations (ownership related) of Bayou and any imminent plans.
>     - Explanation of the supposed $4.2 million withdrawal in 2002.
>     - Explanation for the termination of Westervelt.

P-CSG Ex. 20.  The June 3 email concluded: "We are willing to spend as much time as necessary on our

visit to resolve these issues."  The following day Giovannetti sent a letter to Israel raising the same issues,

albeit in greater detail.  P-CSG Ex. 21.[18]  Giovannetti's letter concluded that "We would not expect this visit to last more than a day but they [CSG representatives] would be prepared to stay longer if necessary" and that "timing is of the essence."

CSG did not receive any response from Marino, Israel or anyone else at Bayou in response to CSG's June 3 email to Marino or Giovannetti's June 4 letter to Israel.  Accordingly, on June 17, 2004 CSG sent an email to all "Consultants" under the subject "Bayou – VERY IMPORTANT" stating that "due to Bayou's lack of attention to our request . . . we are redeeming all AIS clients from Bayou as soon as possible (possibly June 30) and recommend that you consider doing the same for your clients," and concluding "PLEASE GO THROUGH YOUR CLIENT BASE ON YOUR OWN AND MAKE SURE THAT ALL OF YOUR CLIENTS ARE COVERED."  P-CSG Ex. 25.

Apparently alerted that CSG was prepared to recommend that its clients redeem their Bayou investments, Marino contacted CSG and a meeting was scheduled with representatives of CSG and Centennial at Bayou's offices in Connecticut on June 22, 2004.   The meeting was attended for Bayou by Marino and an accountant but not Israel, and by Giovannetti and Voldeng for CSG and Brian McNeil for Centennial.  It lasted approximately ten minutes.   To summarize, Marino refused to answer questions concerning the *Westervelt* complaint, rejected requests to review prime broker statements and other supporting documentation for the NAVs and refused to arrange for a meeting with the auditor for the Bayou hedge funds.[19]

The following day, June 23, 2004, Giovannetti addressed a formal letter to Israel express-ing regret over CSG's decision to recommend that its clients redeem their Bayou investments and explaining as follows:

> You and your firm have been accused with violating SEC and NASD rules and regula-tions in a legal document filed with a LA court.  Furthermore, these documents allege a willful intent to act outside the bounds of your fiduciary duty to the investors in your

---

[18]    Giovannetti's letter to Israel appears to be misdated October 11, 2006.

[19]    As plaintiffs point out, "section 6.4 of each of the Bayou Hedge Funds' Operating Agreements expressly permitted investors to review the Bayou Hedge Funds' account statements and other books and records upon request."  Omnibus Memorandum at 80.

funds.  As we had explained, we recognize there are usually two sides to every story and
we were interested in yours but Mr. Marino clearly stated that he was unwilling to share
your side with us so we are left only with the story of your accuser.

In addition, we were in need of reviewing the NAV calculation procedure and indepen-
dently verifying the veracity of the performance numbers being provided by Bayou to the
offshore administrator.  Independent verification is a critical component in preventing
fraud, one of the more significant risks in hedge fund investing.  Once we discovered that
the offshore administrator did not verify the information, we were left with no alternative
but to do so ourselves.  Again, despite having been told of this desire before hand, Mr.
Marino refused to cooperate with our efforts.

P-CSG Ex. 27.

On June 23, 2004 CSG began the process of recommending to its clients that they redeem

their investments in the Bayou hedge funds.   The facts with respect to each of the CSG and Centennial

clients are set forth separately below.  In addition to separate communications with the individual clients,

CSG prepared a letter dated June 25, 2004 (P-CSG Ex. 32) which was sent to each of its clients

explaining the reasons for the recommendation to redeem.   The June 25 letter began: "As part of our on-

going due diligence, CSG became aware of two matters pertaining to Bayou Management Company that

required further review."  One was the fact "that the new offshore administrator hired by Bayou for

Bayou Fund, LTD was not independently computing or verifying the NAV calculations provided monthly

by Bayou."  Because of this "we felt it necessary to perform our own internal check on the NAV

calculation process and to independently verify a recent NAV by reviewing Prime Broker statements and

reconciliation for that period."   The other matter referred to in the June 25 letter was the *Westervelt* com-

plaint, which was partially quoted.  The letter said: "After having read a copy of the complaint, we re-

quested that Bayou provide us with a response to the charges so that we have a balanced presentation of

the issues."  The letter noted that "[b]oth of these requests were made in writing and a meeting to review

the information was requested."  The letter summarized the outcome of the abortive June 22 meeting,

noting that, as to the *Westervelt* complaint, Marino "was unwilling to discuss the issues regarding the

legal matter in any detail" and "wasn't willing to provide a copy" of Bayou's written response to the com-

plaint.  As to CSG's request to review the NAV calculation process and prime broker statements, "Mr.

Marino refused to allow this review" and "declined our request and left the room."  The June 25 letter

then stated:

> Given that we cannot determine the significance of the legal claims and cannot verify the
> accuracy of the performance or NAV calculations claimed for Bayou for the Fund in
> which you are invested, we feel it only prudent to recommend that you request a full
> redemption of your investment in these Funds at the next possible redemption date.

Other than defendant Mary Jane Pidgeon Sledge (point III D 2, above), there is no dispute that all of the

defendants who were CSG investment advisory clients received the June 25 letter.

### 4.      Imputation of CSG's knowledge to its clients

The summary of evidence in the preceding section concerning CSG's insistent but futile

efforts to obtain any refutation of the serious charges in the *Westervelt* complaint or any verification of

the integrity of the publicly-reported NAVs for the Bayou hedge funds demonstrates beyond dispute (i)

that CSG and Centennial were both objectively on inquiry notice and subjectively deeply concerned about

the fiscal and financial integrity of Bayou and the probity of Israel and Marino, (ii) that these concerns

were what motivated their decision to recommend to all their clients prompt redemption of their Bayou

investments, and (iii) that these concerns were communicated to their clients as the reason for redemption.

The so-called Sonnenschein defendants (twelve of which are discussed under point 5,

immediately following) argue that CSG's knowledge cannot be "imputed" to them because CSG was not

their "agent" with "control" over their investment decisions.   It is a hard argument to make given the un-

disputed facts that each of these defendants was an investment advisory client of CSG, that as such CSG

was indeed their agent for purposes of performing due diligence and making investment recommenda-

tions, and that all these defendants followed CSG's recommendation to redeem.   An agency relationship

is contractually defined by its own terms.  The fact that a CSG client did not control the methods of

CSG's due diligence or that CSG did not control its clients' ultimate decisions does not change the fact

that CSG was contractually and in fact its clients' agent for the purposes of performing due diligence and

recommending redemption or investment.  As these defendants concede, "CSG did the required due dili-

gence, made investment recommendations, and advised the Sonnenschein Defendants on what invest-

ments to make or redeem."  Memorandum at 35-36.

But more important, the Sonnenschein defendants' argument on imputation misses the point.  Imputation of CSG's knowledge to its clients is not necessary, because all of the Sonnenschein defendants were on actual, objective inquiry notice of the facts which motivated CSG's recommendation to redeem.  The burden is on the defendants to establish their "good faith" defense under Section 548(c).  On this motion for summary judgment, the burden is on each defendant to proffer evidence from which a trier of fact could conclude that it redeemed its Bayou investment for a good faith reason and not because it was on objective inquiry notice of infirmity in its Bayou investment.  On the undisputed facts presented here, however, the Sonnenschein defendants' own knowledge of CSG's well-founded reasons for recommending redemption undermines these defendants' ability to sustain their burden of proving a good faith defense regardless of any state law rules relating to imputing an agent's knowledge to its principal.

As acknowledged in the Sonnenschein defendants' Memorandum of Law at 36:

> Inasmuch as the Sonnenschein Defendants' good faith under section 548(c) is determined with reference to an objective legal standard as a matter of law (i.e., what they objectively knew or should have known), *In re Agric. Research and Tech. Group, Inc.*, 916 F.2d 528, 535-536 (9th Cir. 1990), and because there is no dispute here concerning the facts applicable to that standard, determination of the Sonnenschein Defendants' good faith defense on this summary judgment motion is appropriate.

We turn now to an examination of the facts with respect to each defendant.  There is no triable issue of fact as to the reason for CSG's recommendation to these defendants to redeem their Bayou investments.  And, as shown below, not one of these twelve defendants has even argued that it redeemed its Bayou investment for any reason other than CSG's recommendation and the damaging information concerning Bayou, Israel and Marino revealed by the investigation conducted by CSG and Centennial in June 2004 ending with the June 22 meeting.

### 5.    Facts specific to the CSG or Centennial clients

#### (a)    Redwood Growth Partners, L.P. (Adv. Proc. No. 06-08318)
#### Heritage Hedged Equity Fund LP (Adv. Proc. No. 06-08333)

Redwood Growth Partners, L.P. ("Redwood") and Heritage Hedged Equity Fund LP ("Heritage Hedged") are both "funds of funds" managed by Centennial.  Joe Wade, President of Centennial, and Brian McNeil, an accountant and officer of Centennial, were both involved in and had full

knowledge of the events described above leading to CSG's and Centennial's decision to advise their clients to redeem their Bayou investments. McNeil attended the June 22 meeting with Dan Marino at Bayou's Connecticut office. While CSG did not make the final decision to redeem for its clients, Centennial's President Wade did make the decision to redeem the Redwood and Heritage Hedged investments in Bayou promptly after McNeil reported to him on the June 22 meeting. On June 24 Wade submitted redemption requests to the Bayou hedge funds for Redwood and Heritage Hedged.

There is no proffer of any evidence that Redwood or Heritage Hedged redeemed their Bayou investments for any reason other than the facts summarized above.

There is no issue of fact requiring a trial with respect to Redwood and Heritage Hedged, and plaintiffs are entitled to summary judgment as a matter of fact and law with respect to these defendants.

### (b)      Christian Brothers High School Endowment (Adv. Proc. No. 06-08320)

Christian Brothers High School Endowment (the "High School Endowment" or the "Endowment") is a "fund of investments" owned by Christian Brothers High School in Memphis, Tennessee. The High School Endowment is managed by a Finance Committee of the High School's Board of Directors chaired by Thomas Sullivan, a certified public accountant with experience as an auditor.

The High School Endowment did not do any of its own research or due diligence. During the time of its Bayou investment, CSG was and still is the Endowment's sole investment advisor, and the Finance Committee relied heavily on CSG for advice and due diligence with respect to all its investments.

On CSG's recommendation, the High School Endowment made its first investment of $500,000 in the Bayou Fund in April 2002, which was rolled over into the Bayou No Leverage Fund when the Bayou Fund was closed. The Endowment invested an additional $600,600 in Bayou No Leverage Fund in May 2003 and another $500,000 in Bayou No Leverage Fund in January 2004. Sullivan re-

ceived emails on March 28, 2004, April 2, 2004 and as late as May 28, 2004 from CSG's Giovannetti en-

thusiastically commending the performance of the Bayou hedge funds.

However, after CSG's enthusiasm for Bayou evaporated as described above, on June 24,

2004, at the request of CSG Sullivan met with Giovannetti and two other representatives of CSG at the

CSG offices for about an hour during which the CSG representatives explained their concerns about

Bayou and that CSG "could not verify the accuracy of the performance or NAV calculations claimed by

Bayou for the fund that [the High School Endowment] was invested in." (quoting from Sullivan's deposi-

tion).   Sullivan testified that CSG told him that Marino "refused to allow CSG to conduct that review of

the NAV calculation process and became agitated at that request."  Sullivan carefully reviewed the two-

page letter dated June 25, 2004 which CSG sent to all its clients recommending redemption, which

closely tracked the discussion at the meeting.

On June 25, 2004 Sullivan emailed the other members of the Finance Committee to re-

port on his meeting with CSG and communicate his recommendation that the Endowment redeem its in-

vestment in Bayou No Leverage Fund.  Sullivan testified that he was concerned about the Bayou hedge

funds' reported net asset values because "how do you know how well you're performing if you don't

know what your net asset value is, and if you can't independently verify it" and "you like to be able to

test a number against . . . some other document or source in order to have assurance that your number is

calculated properly."   In his email to the members of the Finance Committee Sullivan noted that CSG's

requests for additional information regarding the *Westervelt* lawsuit and other information have been

"stonewalled by Bayou's CFO" and that "little if nothing additional was provided from Marino. . . .

Marino would not provide additional information [and] [t]he meeting broke up on an angry note."  The

email further stated that although CSG "have not noticed anything that indicates the fund has not per-

formed according to reports," nevertheless "this recent reluctance on Bayou's part to provide 'transpar-

ency' to operations is disturbing.   Additionally, some other investors have experienced similar

treatment."

Members of the Finance Committee responded promptly to Sullivan's June 25 email.

One of them stated that "[b]ased on my experience, there is no acceptable reason for Bayou to act as they have.  We need to get out as quickly as possible.  Yesterday is not soon enough."  Another stated that "we do not need to mess around with these characters."

By the end of the day on June 25, 2004, with the strong concurrence of the other members of the Finance Committee, Sullivan signed the redemption letter and submitted it to Bayou No Leverage Fund.  Sullivan testified that the Finance Committee did not do any further investigation with respect to the Bayou funds because this would be like "rearranging the deck chairs on the Titanic" since the decision to redeem had already been made.

There can be no doubt that Sullivan and the other members of the Finance Committee had both objective and subjective notice and knowledge of the fact that there was some problem with the Bayou hedge funds which could not withstand the scrutiny which the High School Endowment was entitled to and was denied.[20]  The High School Endowment has offered no reason for its redemption other than the recommendation by CSG, and Sullivan was fully informed of the facts underlying CSG's recommendation.  On these facts there is no basis for the High School Endowment to invoke the good faith defense under Section 548(c).

      **(c)**        **D. Canale Beverages, Inc. (Adv. Proc. No. 06-08321)**
                      **John D. Canale III (Adv. Proc. No. 06-08336)**

D. Canale Beverages, Inc. and its successor ("D. Canale") and John D. Canale III ("John Canale") (collectively the "Canale defendants") were clients of CSG and sought full redemption of their

---

[20]      Sullivan stated in his affidavit in opposition to plaintiffs' motion and in support of the High School Endowment's motion:

      34.  The clear sense I got from hearing CSG's description of its meeting [on June 22] with Bayou was that Bayou had serious internal administrative and back-office issues that could negatively impact the High School Endowment's investment.

      35.  As I testified at my deposition in this matter, the High School Endowment had had two bad experiences prior to Bayou when internal problems negatively affected money managers with whom the High School Endowment had invested and thus negatively affected the High School Endowment's investments.

investments in Bayou hedge funds on June 25, 2004 promptly after having been advised to do so by CSG.

      D. Canale is a corporation wholly-owned by John Canale and his brother Christopher. John and Christopher were informally advised by Michael Robinson with respect to investments, and in 2003 Robinson became President of D. Canale & Co., which is a separate corporation engaged in the investment business. As of 2004 the Canale defendants were not merely clients of CSG but directly and indirectly had ownership interests in CSG and Centennial. During the time of their Bayou investments, John and Christopher Canale were investment advisory clients of CSG and always followed the advice of CSG's Chief Executive Officer, Lee Giovannetti, in particular with respect to their Bayou investments. The Canales expected CSG to conduct extensive due diligence concerning the Bayou hedge funds because, as testified by John Canale, "that is what I pay them to do."

      Until late June 2004 the Canale defendants were pleased with their investments in the Bayou hedge funds, and they had each received emails from Giovannetti dated March 28, April 2 and May 28, 2004 extolling the Bayou hedge funds.

      The decision to redeem the Canale defendants' Bayou investments was made by John Canale, Christopher Canale and Michael Robinson based solely on the recommendation to redeem of CSG. John Canale had a meeting with CSG representatives at his office in late June 2004 at which CSG told him that "Bayou refused to give them [CSG] the information to do their due diligence." Both Canale defendants received CSG's June 25 letter addressed to all its clients recommending redemption and explaining the reasons therefor. Michael Robinson confirmed at his deposition that for him the decision to redeem was based on the June 25 letter. Both Canale defendants executed and sent redemption letters to Bayou on June 25, 2004.

      Neither of the Canale defendants has asserted any reason to redeem other than the CSG recommendation and letter of June 25.

      Upon the foregoing facts, there is no basis for the Canale defendants to invoke the good faith defense under Section 548(c).

(d)    **Marvin E. Bruce Living Trust (Adv. Proc. No. 06-08368)**

The Marvin E. Bruce Living Trust ("Bruce Trust") is a living trust formed by Marvin

Bruce ("Bruce").  Bruce was a founding partner in Centennial, was a partner at Centennial during the time

he was invested in the Bayou hedge funds and is still a partner with a 24% interest in Centennial.  He was

a member of Centennial's Board of Directors in June 2004.

CSG has been Bruce's sole investment advisor since 1994, and he relies heavily on CSG

with respect to his investments.  Lee Giovannetti and Tony Graves were Bruce's primary contacts at

CSG.  Bruce did not conduct any of his own due diligence on his investments "because I knew they

[CSG] were doing the job."  Bruce initially invested in the Bayou Fund in May 2001 and subsequently

made additional investments in the Bayou hedge funds, all based solely on CSG's recommendation.

Bruce depended entirely on CSG for investment research and recommendations, testifying: "CSG did all

the research and followed the company.  I did not attempt to try to go and check on the company to find

out how well off they were or anything like that.  I depended totally on CSG to advise me on that."  Prior

to late June 2004 Bruce was entirely satisfied with the Bayou hedge funds, and like other CSG clients, he

received Giovannetti's emails dated March 28, April 2 and May 28 commending the performance of

Bayou.

Shortly after CSG's meeting with Marino on June 22, 2004, described in point III E 3,

above, Tony Graves of CSG called Bruce and informed Bruce fully as to CSG's reasons for requesting

the meeting, Marino's response to questions at the meeting and Marino's refusal to let the CSG "people

go in and audit" and refusal to arrange a meeting with the Bayou hedge funds' auditors.  It was a "shock"

to Bruce that Bayou would refuse to allow CSG to perform the auditing and due diligence which it

needed to advise its clients.

After learning about the June 22 meeting between CSG representatives and Marino,

Bruce called Michael Robinson, who was a friend of Bruce and had been an owner of CSG since 1990, in

order to ask Robinson for his "thoughts on this situation."  Bruce testified that when he told Robinson that

he was contemplating redeeming his Bayou investments, Robinson replied that "I don't disagree with you

a bit."

There is no dispute that the Bruce Trust redeemed its Bayou investment solely on the basis of CSG's recommendation and that Bruce was fully informed by Tony Graves of CSG of what transpired at the June 22 meeting and the concerns which motivated CSG's recommendation to redeem. The Bruce Trust has not asserted any other reason for its decision to redeem. On these facts there is no basis for the Bruce Trust to invoke the good faith defense under Section 548(c).

### (e)    Mary P. Smythe Residuary Trust (Adv. Proc. No. 06-08338)

In June 2004 Frank W. Smythe, Jr. was trustee of the Mary P. Smythe Residuary Trust ("Smythe Trust"). As trustee, Frank Smythe was the person who requested redemption of the Smythe Trust Bayou Superfund investment. Mr. Smythe subsequently died and Mary P. Smythe is also deceased. The Successor Trustee of the Smythe Trust is First Tennessee Bank, which apparently has no information concerning the Smythe Trust redemption of its Bayou investment.

Michael Robinson (referred to above in the sections concerning the Canale defendants and the Bruce Trust) was a family lawyer for the Smythes and was involved in the Frank Smythe's decision to redeem. The facts relied upon by plaintiff Bayou Superfund in support of its motion for summary judgment in the Smythe Trust adversary proceeding are based on the deposition testimony of Michael Robinson.

CSG has been the Smythe Trust's sole investment advisor from 1988 through the present. The Smythe Trust invested in the Bayou Fund in June 2001 on the recommendation of Lee Giovannetti of CSG and then rolled over into the Bayou Superfund in 2003. There is no evidence that Frank Smythe was ever dissatisfied with the performance of the Bayou Fund or Bayou Superfund as reported by Bayou management, and it is undisputed that the Smythe Trust's decision to redeem its Bayou Superfund investment in June 2004 was not related to reported performance.

On June 23, 2004 CSG emailed a draft redemption letter for the Smythe Trust to Michael Robinson. Michael Robinson advised Frank Smythe to sign the redemption letter because "we don't have a choice" and "we can't go against the recommendation of our investment advisor." Frank Smythe then

signed the redemption letter and submitted it to Bayou Superfund. As noted in the above section on the

Canale defendants, Michael Robinson received the formal letter from CSG dated June 25, 2004

explaining the reasons for the recommendation to redeem.

The foregoing facts are not in dispute. The Smythe Trust does not have any witness with

personal knowledge to support a good faith defense. There is no evidence that Frank Smythe had any

reason other than CSG's recommendation for his decision to redeem. On these facts there is no basis for

the Smythe Trust to invoke the good faith defense under Section 548(c).

> **(f)** **KFI Capital Partners LLC (Adv. Proc. No. 06-08337)**
> **YK Investment Partnership II (Adv. Proc. No. 06-08341)**
> **Helen Yulman Revocable Trust (Adv. Proc. No. 06-08332)**
> **Mayer and Morris Kaplan Foundation (Adv. Proc. No. 06-08340)**

The defendants in these four adversary proceedings — referred to herein as "KFI

Capital," "YK Partnership," the "Yulman Trust" and the "Kaplan Foundation" (collectively, the "KFI-

related defendants") — are all supervised by a "family office" called Kaplan Family Investments ("KFI").

KFI is an umbrella entity that manages the investments of various investment vehicles affiliated with the

Kaplan and Yulman families, including the four KFI-related defendants.

Randy Joseph is the Executive Director of KFI, assisted by Marlene Nei, the Office

Manager. Joseph made the investment decisions for KFI Capital, a portfolio of hedge funds. Bert Kaplan

and Richard Yulman make the investment decisions for YK Partnership after conferring with Joseph on

those decisions. Richard Yulman had decision-making authority for the Yulman Trust in consultation

with KFI as his "family office." The investment portfolio of the Kaplan Foundation, a charitable

foundation, was managed by Joseph together with CSG.

During the time that the four KFI-related defendants had investments in the Bayou hedge

funds, KFI and the KFI-related defendants relied heavily on CSG's investment advice, which was then

KFI's only investment advisor.  In particular each of the KFI-related defendants invested in the Bayou

hedge funds in reliance on CSG's recommendations. Although it provided investment advice to the KFI-

related defendants, KFI itself did not do any "operational due diligence" but relied upon and expected

CSG to "[d]o whatever due diligence was needed to satisfy themselves that it was a manager that was going to meet our goals of maximizing return without losing our principal." Once a manger was selected, CSG was responsible for the "performance reporting and monitoring of the managers."

Until the end of June 2004, KFI was "very happy" with the Bayou hedge funds, which were reporting good performance with "consistent, steady returns." As Nei testified, "there was nothing to trigger any alert."

The alert was triggered on June 22, 2004. At the end of that day Kurt Voldeng of CSG, who had attended the June 22 meeting with Marino, emailed Joseph to inform him of the meeting and that CSG was "recommending to clients to redeem their investments as soon as possible." Joseph spoke to Voldeng the next day, June 23, who informed Joseph of the substance of the June 22 meeting with Marino and informed Joseph that CSG would be sending him a formal letter with a detailed explanation of the reasons for CSG's recommendation, referring to the June 25 letter described above, which was sent to and received by Joseph. Joseph was "shocked" by the news he had received from Voldeng and CSG's recommendation to redeem the Bayou investments. Following the email and telephone call with Voldeng, Joseph decided to have the four KFI-related defendants redeem their Bayou investments as promptly as possible. Joseph testified:

> Hedge funds are unregulated investment partnerships and if you're not comfortable with them for whatever reason, you get out the next time you can, because what happens in the hedge fund business is because these funds have gates — you don't want to be the last guy in line. You want to be the first guy in line.

It was "significant" to Joseph that Bayou refused to allow CSG to review and audit the NAV calculation process, explaining in his deposition that "[y]ou want comfort that your capital account is what it is, and the NAV calculation is what tells you that your capital account is what it is and not some other number. It's really the accuracy and reliability of their reporting systems and they're just checking it out to get comfort." Bayou's refusal to permit CSG to verify the accuracy of the NAV calculations "would be a concern in any fund if we were unable to get comfort with their internal accounting system and that's what this addresses."

As instructed by Joseph, Nei promptly prepared redemption letters for each of the four KFI-related defendants.  The letters were signed and mailed on that day to Bayou.

The KFI-related defendants have offered no reason for their redemptions other than the recommendation by CSG, and Joseph was fully informed by CSG of the reasons for CSG's recommendation.  On these facts there is no basis for the KFI-related defendants to invoke the good faith defense under Section 548(c).

### (g)  Fred Montesi IRA and Fred Montesi (Adv. Proc. No. 06-08329)

During the relevant period Fred Montesi was a client of CSG in respect of certain of his investments, including Bayou.  He invested in Bayou Fund in December 2001 on CSG's recommendation and subsequently rolled that investment over to Bayou No Leverage Fund when Bayou Fund was closed.  Prior to his redemption from Bayou No Leverage Fund in July 2004, Montesi was pleased with his Bayou investment, and like other CSG clients Montesi received emails dated March 28, April 2 and May 28, 2004 from Giovannetti touting the performance of the Bayou hedge funds.

On July 27, 2004 Dustin Finley of CSG emailed two letters to Fred Montesi, a draft redemption letter for Montesi's Bayou No Leverage Fund investment and a "formal letter . . . which outlines in detail our issues with Bayou."  The "formal letter" to Montesi was the same letter that CSG provided to its clients on or about June 25, 2004, discussed and quoted in point III E 3, above.   Within an hour of receiving the draft redemption letter from CSG, Montesi signed it and faxed it to Bayou and CSG.

Montesi has not asserted any reason for his redemption other than the information he received from CSG on July 27, 2004.  On these facts there is no basis for Montesi to invoke the good faith defense under Section 548(c).

### 6.  H & B Hedge Fund II LLC (Adv. Proc. No. 06-08422)

H & B Hedge Fund II LLC ("H&B") was not a client of CSG nor was it managed by Centennial Partners.  But H&B sought full redemption of its Bayou account in late July 2004 based solely on a "tip" from the President of Centennial.

H&B is a fund of funds.  H&B Inc. managed H&B and made all its investment decisions. Frank Butterfield and Jeffrey Buck were the H&B Inc. representatives who were directly involved in H&B's Bayou investment.   Butterfield, one of the owners of H&B Inc., had primary responsibility for the investment decisions made by H&B during the relevant period, and Buck oversaw H&B Inc.'s invest-ment department and performed many of the responsibilities of a chief investment officer.  Prior to July 21, 2004 H&B Inc. was fully satisfied with the performance of Bayou.

On July 21, 2004 Centennial's President Joe Wade telephoned Buck concerning the Bayou hedge funds.  Wade was part of Buck's "professional network," although this particular call was unexpected.  Butterfield testified that Wade told Buck that Centennial was "pulling his investors out" of the Bayou hedge funds and "was telling people that he knew that were in Bayou to get out as well." Wade recommended to Buck that H&B redeem its Bayou investment.  Buck's contemporaneous notes of his telephone conversation with Wade reflect that Wade informed Buck of Centennial's concerns with respect to certain allegations in the *Westervelt* complaint and Centennial's inability to obtain from Bayou explanation and verification of the calculation of the Bayou hedge funds' NAVs, and he described the un-satisfactory June 22 meeting with Marino.

Following his telephone conversation with Wade on July 21, Buck met immediately with Butterfield, reviewed his notes of what Wade told him in the conversation and recommended that H&B "should get out" of Bayou Superfund.  Butterfield's deposition testimony makes clear that he was objec-tively "on alert" to potential problems with the Bayou funds, and his contemporaneous email to one of his partners and also his testimony confirmed that he was subjectively concerned that Bayou's "track record [was] seemingly too good to be true" and "might be too good to be true."  Butterfield's partner expressed his own concern that "Sam has left for Europe with the investors' money" and stated that "I'm looking forward to getting capital back from them."

Following Buck's report to Butterfield on July 21, he immediately instructed his assistant to determine the "earliest possible date we could exit." On July 28, 2004 H&B submitted its request seeking full redemption of its Bayou Superfund account at the next available redemption date.

H&B has not proffered any reason for redemption of its Bayou Superfund investment other than the information received from Centennial's President, Wade. There is no dispute that Butterfield and Buck had knowledge of the substance of the concerns generated by CSG's and Centennial's investigation culminating with the June 22 meeting in Connecticut with Marino. On these facts there is no basis for H&B to invoke the good faith defense under Section 548(c).

### 7.    Freestone Low Volatility Partners LP (Adv. Proc. No. 06-08373)

Freestone Low Volatility Partners LP ("Freestone") is a fund of funds. Freestone does not have any employees of its own, but is managed by its general partner Freestone Investments. Gary Furukawa was the Managing Member of Freestone Investments, and Ken Myoshi was another employee responsible for due diligence and the selection of money managers.

Freestone invested $2 million in Bayou Accredited Fund in December 2003, followed by additional investments totaling $3.8 million during January-July 2004, bringing its total Bayou investment to $5.8 million. Freestone was well pleased with the reported performance of Bayou Accredited Fund, and its redemption notice to Bayou at the end of October 2004 expressed gratitude "for the excellent returns that Bayou has given us."[21]

In October 2004, in an effort to "upgrade our due diligence process," Freestone obtained two free background reports from two investigative firms. On October 11, 2004 Freestone received a report concerning Israel and Bayou from CheckFundManager.com. On October 14 Freestone received a composite of the same BackTrack Reports that CSG had obtained earlier in 2004. When Furukawa reviewed these investigative reports he "saw some stuff in there that was a little disturbing" and the reports "revealed a number of matters that caused Freestone to be concerned about the integrity of Sam Israel,"

---

[21]    During the brief period of December 2003 through September 2004, Bayou Accredited Fund reported $619,016,000 of fictitious profits on Freestone's account, which were paid to Freestone on redemption.

including "a civil suit filed by Paul Westervelt, a civil suit filed by D'Amore Consulting, comments made in an interview with Leon Cooperman, the fact that Israel attended but did not receive a degree from Tulane, and complaints alleging that Israel had been arrested while operating a vehicle under the influence of alcohol and charged with criminal possession of a controlled substance."   Furukawa described the BackTrack Report as a "red flag" and the *Westervelt* complaint was viewed by Freestone as "significant in terms of the allegations" which were "related to the operations of the fund."   Furukawa was upset that the Bayou management had not previously disclosed to Freestone that Bayou was involved in litigation and believed that management had "lied" about the existence of the *Westervelt* suit and other legal actions.  The CheckFundManager.com Report referred to a customer complaint filed with the NASD in July 2004 that accused Israel of "misrepresentation, excessive trading, failure to disclose, and fraud, among other things."   These and other matters disclosed in the two investigative reports led Freestone to be "concerned about the integrity of Sam Israel."

On October 15, 2004 Freestone contacted Bayou to request a telephone conference to discuss among other things the *Westervelt* and *D'Amore Consulting* cases.  On October 26, 2004 Freestone's entire investment team attended a conference call with Dan Marino in which they discussed the *Westervelt* complaint and other matters raised in the reports.  The Freestone representatives were not satisfied with Marino's response on the conference call.  Both Furukawa and Myoshi testified as to their view that Marino was "evasive" and did not answer questions concerning the *Westervelt* complaint.  As to other matters discussed in the October 26 conference call, Furukawa testified that "[i]t was the same kind of evasive, not really answering our questions, not really shedding any light on what really happened. Just bullshit."

Immediately after the conference call with Marino on October 26, Freestone decided to redeem its entire Bayou Accredited Fund investment "at the earliest date" possible.  A few days later Freestone received Israel's November 3, 2004 letter addressed to all Bayou hedge fund investors concerning the *Westervelt* lawsuit.   After reviewing that letter, Furukawa and Myoshi exchanged emails expressing relief that Freestone "had submitted our notice before other people, if they were planning to

redeem as well" after learning of the *Westervelt* litigation.

Freestone has not asserted any reason for its decision to redeem its Bayou Accredited Fund investment other than its concerns with the integrity of Bayou management prompted by the *Westervelt* litigation and the other information contained in the two investigative reports. On these facts there is no basis for Freestone to invoke the good faith affirmative defense under Section 548(c) of the Bankruptcy Code.

### 8.    Peter Haje IRA and Peter Haje (Adv. Proc. No. 06-08430)

Haje is a former Executive Vice President and General Counsel at Time Warner. After leaving Time Warner in 1999, Haje opened his own law firm and engaged in "legal and investing and writing practice." Plaintiffs' claims against Haje arise out of his relationship with his investment advisor, TAG Associates LLC ("TAG") and its Chief Executive Officer, Stanley Pantowich.

TAG is a licensed investment advisor. Haje has been an investment advisory client of TAG for more than ten years pursuant to a written agreement. His relationship with TAG was based upon his acquaintance with Pantowich for more than twenty years. Pantowich was the primary person at TAG with whom Haje dealt. Haje made his investments for himself and his IRA in Bayou No Leverage Fund on the recommendation of Pantowich. Prior to December 2004, a hedge fund managed by a TAG affiliate (the "TAG Fund") and five of TAG's investment advisory clients, including Haje, were invested in Bayou hedge funds. Until November 2004, TAG and its clients were pleased with the reported performance of the Bayou hedge funds. Concerning his opinion of the performance of the Bayou No Leverage Fund, Haje testified "It was good. Not spectacular, but quite good." (Haje Tr. 46) and "I thought they had done well, not spectacularly, but well." *Id.* at 69.

TAG received a letter dated November 3, 2004 from Israel concerning the *Westervelt* complaint. The next day TAG obtained a copy of the *Westervelt* complaint, which contained a number of allegations of concern to Pantowich. For example, the *Westervelt* complaint alleged that Marino was a principal of the Bayou organization, contrary to Israel's prior representations to TAG that Israel was the sole owner or principal of Bayou, which led Pantowich to fear that "maybe I couldn't trust [Sam Israel]."

Shortly thereafter TAG obtained an investigative report from Financial Risk Management ("FRM"),

which contained other disquieting information concerning Bayou and Israel.

      The *Westervelt* complaint and the FRM Report prompted Pantowich, two TAG em-

ployees and a client and close associate of TAG to attempt to contact Israel on multiple occasions to

obtain Israel's side of the allegations against Bayou, but these attempts were unsuccessful because Israel

did not return their calls.  Pantowich testified that Israel's failure to return these calls was the "final

straw."

      Accordingly, Pantowich recommended to the TAG clients that they promptly redeem

their Bayou investments.  In early December the TAG Fund, Haje, another TAG client and three funds

which were closely associated with TAG and Pantowich all redeemed their Bayou hedge fund invest-

ments.  All of these redeeming investors have entered into settlement agreements with plaintiffs, except

Haje.

      After reviewing the Haje and Pantowich depositions and accompanying exhibits, I con-

clude that Haje has not sustained and cannot sustain a good faith defense under Section 548(c).

      In early November Haje received the November 3, 2004 letter from Bayou signed by

Israel seeking to explain the *Westervelt* complaint.  In late November Haje received a telephone call from

Pantowich and another senior TAG employee, Gonzalez, whom Haje knew and respected.  When asked

for the "sum and substance" of the conversation, Haje testified:

> Stanley [Pantowich] said that since I had invested in Bayou on their recommen-
> dation, that he felt that he should let me know that they were redeeming the fund, the
> TAG fund investments in Bayou.  I don't think I asked him, but I believe he volunteered
> that they know no bad or specifically unfavorable information about Bayou, but they
> were no longer comfortable with their investment.  The only reason that they gave was
> that they had discovered that Mr. Marino was a partner in Bayou, he had not known that
> before, and that George Gonzalez of whom I have a very high opinion, found dealing
> with Mr. Marino very difficult, he was rude and abusive, and TAG was no longer com-
> fortable, they were withdrawing and they wanted me to know.

Haje Tr. 61-62.  After a second conversation with Pantowich shortly thereafter, Haje decided to redeem

his Bayou investment.  Asked the reason for his redemption, Haje testified:

> I no longer felt that I should keep my investment without TAG being there to

- 91 -

monitor it for me.  Once they redeemed I would be on my own in that regard.

*Id.* at 68.   Nevertheless, Haje then acknowledged that as part of his engagement of TAG as his financial advisor "it [was] their responsibility to monitor [his] investments" (*id.*) and that neither Pantowich nor Gonzalez told him that TAG would no longer be monitoring his investment in Bayou.  *Id.* at 69.   Haje testified that he "would expect TAG Associates to contact [him] if there was a concern that they had with respect to one of your investments."  *Id.* at 29-30.

Moreover, Pantowich denied that he ever told Haje that TAG would cease monitoring Haje's Bayou investment.  Pantowich Tr. 93-94.  Pantowich testified (*id.* at 88) that "it [was] TAG's obligation to provide continuing advice with respect to Mr. Haje's investments in any given fund if TAG had recommended that he invest in that fund" and that:

> [o]ur job was to keep our eye on what was going on and inform him if we
> thought there was anything wrong or if we thought he should take his money out.  That is
> our obligation.

Pantowich testified that he personally informed Haje that something was "wrong" with Bayou and that TAG was recommending that he redeem his investment in Bayou.  Pantowich "reiterated to [Haje] as I did with all the other clients the reasons that I think we should redeem."  Pantowich Tr. 91.  Pantowich's recollection of what he told all TAG clients as to the reason for recommending redemption was as follows:

Q.  Did you tell each of TAG's clients the same reasons?

A.  Yes.

Q.  What were the reasons that you shared with your clients?

A.  We were concerned about their organization.  Allegations about the way people department with other people in the organization.  That they may not be paying attention to managing money, but defending lawsuits.  And that Sam Israel wouldn't return my phone call, that is almost enough reason.

Q.  Did you tell the clients that you had called Sam to discuss the allegations in the *Westervelt* complaint?

A.  I told them that I called Sam and he didn't return my phone calls.

Pantowich Tr. 85.

Q.  Did you tell Mr. Haje that you attempted to contact Sam Israel and he didn't return your call?

A.  I did.

*Id.* at 92.

In short, Haje was on objective "inquiry notice" of some problem sufficiently "wrong" with Bayou that would cause his long-time investment advisor on whom he relied to advise immediate redemption of his Bayou investment.  When asked if he had any concerns about Bayou prior to his November conversations with Pantowich, Haje testified "No.  Not at all."  Haje Tr. 62.  Haje himself had received Israel's November 3, 2004 two-page, single spaced letter attempting to explain the *Westervelt* litigation, and he knew that Pantowich and others had repeatedly called Israel to hear his side of the Westervelt allegations and that Israel had not returned their calls.

Haje was thus objectively on inquiry notice of red flags, and he promptly acted on the basis of that knowledge to redeem his Bayou investment.  As Haje has acknowledged in his opposing memorandum of law:

> [I]t is well settled that a transferee may not remain willfully ignorant of facts that would cause it to be on notice of a debtor's fraudulent purpose and then put on blinders prior to entering into a transaction with the debtor and claim the benefit of Section 548(c)'s good faith defense.  *Manhattan Inv. Fund*, 359 B.R. at 524 (citations omitted); *In re Model Imperial, Inc.*, 250 B.R. 776, 798 (Bankr. S.D. Fla. 2000) *citing In re Cannon*, 230 B.R. 546, 592 (Bankr. W.D. Tenn. 1999); *In re World Vision Entm't, Inc.*, 275 B.R. 641, 659 (Bankr. M.D. Fla. 2002).  *See also* 11 U.S.C. § 548(c).

Haje has asserted no independent good faith reason for redeeming his Bayou investment.  His sole reason for redemption was the recommendation of Pantowich described above.  On these facts there is no basis for Haje to invoke the good faith defense under Section 548(c).

## IV.    Fictitious profits calculation on 2003 fund exchanges

Certain defendants represented by the Sonnenschein firm initially invested in the original Bayou Fund.  When the Bayou Fund was closed at the end of 2002, these Sonnenschein defendants exchanged their Bayou Fund accounts in February 2003 for accounts in the three Bayou hedge funds.  Since

the Bayou Fund was insolvent at December 31, 2002, any purported profits reflected on the Bayou Fund

account statements of these Sonnenschein defendants necessarily were fictitious.

These Sonnenschein defendants now argue that, for purposes of calculating the amount of

their redemption payments constituting fictitious profits, their investments in the Bayou hedge funds

should be the amounts reflected on their inflated Bayou Fund account statements, including the fictitious

profits falsely reported in their Bayou Fund accounts.   They argue:

> Plaintiffs assume that a defendant's investment in Bayou Fund determines the
> base principal from which all allegedly avoidable profits must be calculated.  However,
> from a Federal tax and securities law perspective, the required exchange from Bayou
> Fund to one of the Bayou Hedge Funds in February 2003 constituted a new investment
> on the part of the Sonnenschein Investors.  Thus, the principal investment of each
> Sonnenschein Defendant is the date of investment in a Bayou Hedge Fund.  Finally, the
> Plaintiffs in these adversary proceedings began the existence in February 2003 and
> cannot rely on principal investments amounts prior to that date.

Sonnenschein defendants' Memorandum 38-39.

The defect in the argument is that it ignores the fact that these Sonnenschein defendants'

actual investments in the Bayou hedge funds were less than the amounts reflected on their Bayou Fund

final account statements.  To the extent that a defendant's Bayou Fund account exceeded his proportion-

ate share of the net asset value of the Bayou Fund, that defendant's purported investment in one of the

new Bayou hedge funds was inflated to the same extent.   Indeed, the actual value of a defendant's Bayou

Fund account based on the actual NAV of the Bayou Fund almost certainly was less than that defendant's

original investment in the Bayou Fund, in which case the theory advanced by these Sonnenschein defen-

dants would result in an increased, not reduced, calculation of the fictitious profits portion of their re-

demption payments.

Because Israel and Marino did not observe the corporate separateness of the three Bayou

hedge funds and the other Bayou entities, it is impossible to determine how Bayou Management deployed

the assets in Bayou Fund amongst the three Bayou hedge funds, although we may safely assume that

those Bayou Fund investors who did not elect to exchange were redeemed at inflated values, thereby

further fraudulently diminishing the remaining Bayou Fund assets to the disadvantage of those investors

who did exchange.  Under the circumstances, I conclude that it is appropriate and practical to credit these Sonnenschein investors with the full amounts of their investments in Bayou Fund, rather than the lesser amounts representing their proportionate shares of the actual Bayou Fund final NAV, which would almost certainly be to their disadvantage.  But in no event is it appropriate to pile fiction on fiction by deeming these investors' final Bayou Fund account statements, including fictitious profits, to be the value of their investments contributed to the Bayou hedge funds.

### Orders

In the interests of consistency and administrative efficiency, plaintiffs' counsel will prepare appropriate orders in all adversary proceedings consistent with this Decision (including those adversary proceedings in which I have ruled in favor of defendants) for review and approval as to form by counsel for defendants, without prejudice to the right of any party to appeal.   Controversy as to form of the orders will be resolved by the Court as necessary.

Dated:  White Plains, NY
         October 16, 2008


                              /s/ Adlai S. Hardin, Jr.
                                  U.S.B.J.